**In re Robert Harold GRANT, Cherry Ann Grant, Debtors.**

**Bankruptcy No. 585–138.**

United States Bankruptcy Court, N.D. Ohio.

July 22, 1985.

Gerald D. Piszczek, Strongsville, Ohio, for debtors.

Robert Harold Grant and Cherry Ann Grant, pro se.

Kathryn Belfance, Akron, Ohio, trustee.

HAROLD F. WHITE, Bankruptcy Judge.

This matter came before the Court on its own motion pursuant to 11 U.S.C. Section 707(b) for the purpose of determining whether or not the within Chapter 7 petition should be dismissed on the grounds that the granting of relief would be a substantial abuse of the provisions of Chapter 7. Hearings were held on May 9, 1985 and June 10, 1985 wherein the debtors, Robert Harold Grant and Cherry Ann Grant, were examined by the Court, and documentary evidence was submitted.

The debtors were represented by Gerald D. Piszczek; Kathryn A. Belfance appeared as interim trustee/trustee; Michael R. Huff appeared as case administrator.

## FINDINGS OF FACT

1. Robert Harold Grant and Cherry Ann Grant fka Brock filed a joint Chapter 7 petition on February 7, 1985 which listed one creditor with a secured claim on their residence in the sum of $72,000.00, and 24 unsecured creditors with an aggregate amount of claims in the sum of $63,765.00.

2. On February 7, 1985 the debtors filed a Schedule of Current Income and Expenditures with total monthly income in the sum of $3,385.00 and total monthly expenditures in the sum of $4,806.01, having a net monthly deficiency in the sum of $1,448.01.

3. The most significant assets of the debtors as listed on the schedules filed with their petition are a single family residence with a market value of $72,500.00, a 1982 240D Mercedes (leased) which is listed as husband's property with a market value of $15,000.00, and an unliquidated debt owing Cherry Grant for child support arrearages in the sum of $8,600.00.

4. On February 7, 1985 debtors filed as an attachment to their Joint Statement of Financial Affairs for Husband and Wife Not Engaged in Business and in answer to Item 11 therein, a list of loans repaid from January 3, 1984 to October 21, 1984 indicating check number, date of payment, payee and amount of payment.

5. On March 20, 1985 the Court upon its own motion pursuant to 11 U.S.C. Section 707(b) ordered the debtors to appear before the Court on May 9, 1985 for the purpose of determining whether or not their Chapter 7 petition should be dismissed.

6. On May 2, 1985 the debtors filed an amended Summary of Debts and Property and amended Schedules A-3, B-2, B-3 and B-4, showing unsecured claims without priority in the sum of $65,765.00.

7. On May 21, 1985 the Court filed an order:

(a) Adjourning the May 9 hearing until June 10, 1985;

(b) Finding that the debtors were entitled to income tax refunds from the United States of America and the State of Ohio in excess of $5,319.20;

(c) Finding that the Schedule of Current Income and Expenditures previously filed was inaccurate as to expenses; and

(d) Directing the debtors to file a new projection of income and expenditures.

8. On May 23, 1985 the debtors filed a new Schedule of Income and Expenditures with total monthly income in the sum of $3,358.00 and total monthly expenditures in the sum of $3,333.50, leaving a net monthly excess of $14.50.

9. The reduced monthly expenditures of the second Schedule of Income and Expenditures is due to the following adjustments:

(a) $300.00 reduction in rent/home mortgage assuming the debtors move closer to the husband's place of employment;

(b) $210.00 reduction in utility costs;
(c) $283.00 reduction in clothing allowance;

(d) $335.00 reduction in entertainment expenses; and

(e) various reductions in food, medicine and drugs, insurance, taxes and miscellaneous.

10. Monthly expenditures for transportation in the second schedule have increased by the sum of $180.00.

11. Robert Grant has surrendered his 1982 240D Mercedes to the leasing company, and replaced it with two leased vehicles, a 1985 Nissan at the rental rate of $230.00 per month, and a 1985 Cutlass Sierra at the rental rate of $260.00 per month.

12. Robert Grant is employed by the Huron Road Hospital as Vice-President of Human Resources and Personnel, and has been in its employ for a period of approximately 3 and ½ years.

13. Robert Grant had gross income in the sum of $48,000.00 for 1982, $54,000.00 for 1983, $60,000.00 for 1984 and will earn $65,000.00 in 1985.

14. Robert Grant's income has increased at the rate of 9 percent annually in recent years, and will in all likelihood continue to increase at that rate.

15. There are two minor children residing at the Grant household, ages 12 and 16 years.

16. Cherry Grant is not employed.

17. Robert Grant's net earned income is deposited directly with Society National Bank by his employer.

18. Robert Grant has an emancipated son who resides in Charleston, South Carolina.

19. An appraisal of the personal property at the premises at 977 Damon Road, Medina, Ohio as performed by Chester B. Rector and filed herein shows the fair market value of all items listed therein to be the sum of $1,772.00.

20. Robert and Cherry Grant have not made any payments on any of their major credit card accounts since late October, 1984.

21. Of the total number of unsecured creditors, there are represented 7 major credit card accounts in the aggregate sum of $29,700.00, the largest amount being a 1983 Mastercard account with Society National Bank in the sum of $10,800.00.

22. Joe Huggins is listed as an unsecured creditor of a personal loan in the listed amount of $9,000.00 on Schedule A–2, but is not listed in the attachment to the Joint Statement of Financial Affairs in response to Item 11 therein.

23. During the period covered by the response to Item 11 of the Joint Statement of Financial Affairs the minimum sum of $6500.00 was paid to Joe Huggins according to the check register and cancelled checks of the debtor Robert Grant of his personal checking account at Society National Bank.

24. A reasonable reduction in the style and cost of living of Robert and Cherry Grant, and a corresponding reduction in their amended Schedule of Income and Expenditures, would net an annual savings of approximately $8904.00, exclusive of any income tax refunds or the curing of any child support arrearages.[1]

---

1. Schedule of Current Income and Expenditures as amended:

25. Such an annual savings could fund a five-year Chapter 13 plan which would pay approximately 68 percent of all unsecured creditors' claims as listed by the debtors in their schedules, irrespective of any increase in the income of Robert Grant, or of any employment on the part of Cherry Grant.

26. The debtors have not suffered any sudden economic hardship, serious illness, high medical costs, unemployment or other unforeseen calamities.

27. The debtors list on their schedules credit card debts in the aggregate sum of $39,373.50, which appear to be for cash advances and consumer purchases.

28. The only secured creditor listed is Society National Bank, home mortgagee.

29. The debts listed in the amended debtors' Schedule A–3, are primarily consumer debts constituting a minimum of 90 percent of all debts, or the sum of $59,188.50.

30. The Parisian Company, a scheduled unsecured creditor herein, has filed a complaint to determine dischargeability of a debt in the sum of $1,971.70 pursuant to 11 U.S.C. Section 523(a)(2)(A).

31. The pre-petition purchases of the debtors for clothing, entertainment, Christmas presents exhibit the extravagance of their life style, and utter disregard of sound financial planning.

### DISCUSSION OF LAW

On June 29, 1984 Congress passed a 105-page revision of the bankruptcy laws, and the president signed the Bankruptcy Amendments and Federal Judgeship Act of 1984 into law on July 10, 1984.[2] The passage of those amendments was preceded by significant argument and compromise surrounding the consumer credit amendments. This court is called upon for the first time to decide a matter related to one of the new consumer credit provisions: whether a joint petition for chapter 7 relief should be dismissed as a substantial abuse of the provisions of chapter 7.[3]

| | AS SCHEDULED | ADJUSTMENTS |
|---|---|---|
| **INCOME:** | | |
| TOTAL | $3,358.00 | |
| **EXPENDITURES:** | | |
| Rent or home mortgage payment (include lot rental for mobile home) | $ 600.00 | |
| Utilities (Electric 65 Heat 135 Water 35 Telephone 50 | $ 285.00 | ( $35.00) |
| Food | $ 625.00 | ($125.00) |
| Clothing | $ 267.00 | ($167.00) |
| Laundry and Cleaning | $ 65.00 | ($ 15.00) |
| Newspapers, periodicals and books (including school books) | $ 35.00 | ($ 20.00) |
| Medical and drug expenses | $ 15.00 | |
| Insurance (not deducted from wages) Auto | $ 69.00 | |
| Other | $ 0.00 | |
| Transportation | $ 580.00 | ($280.00) |
| Other | $ 0.00 | |
| Recreation | $ 115.00 | ($ 45.00) |

| EXPENDITURES: | | ADJUSTMENTS |
|---|---|---|
| Dues, union, professional, social or otherwise (not deducted from wages) | $ 0.00 | |
| Taxes (not deducted from wages) | $ 0.00 | |
| Alimony, maintenance, or support payments | $ 0.00 | |
| Other payments for support or dependents not living at home | $ 400.00 | |
| Religious and other charitable contributions | $ 15.00 | |
| Other (specify) | $ 262.50 | ($ 55.00) |
| TOTAL | $ 3333.50 | ($742.00) |

(a) Total adjustments of $742.00 per month of additional disposable income.

(b) $742.00 × 12 mos. × 5 years = $44,520.00

(c) $44,520.00 ÷ $65,765.00 = 68% payment plan

2. Pub.L. 98–353, 98 Stat. 333 (1984).

3. Among the consumer credit amendments which were added by Title III, Subtitle A were:

    1. a provision prohibiting debtor from re-filing a petition which has been dismissed within the prior 180 day period for failure to follow court orders;

    2. consumer debtors must be apprised of each form of relief available under the Bankruptcy Code by the bankruptcy court clerk;

The new section 707(b) added by the 1984 amendments provides that:

> After notice and a hearing, the court, on its own motion and not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

Pub.L. No. 98–353, section 312. This new section is effective for cases filed after October 7, 1984. *Id.* at section 553.

Since this is a matter of first impression, the court must look behind the new provision to its legislative history to determine the proper standard for judicial application. The primary rule of the interpretation of statutes is to ascertain and declare the intention of the legislature, and to carry such intention into effect. Although statements made by legislators on the floor are not the best indication of legislative intent,

> Statements made by individual legislators during floor debates are also considered, along with information about contemporary conditions and events, when they establish what problems or evils the legislature was trying to remedy.

2A N. Singer, *Statutes and Statutory Construction* sect. 48.13 (4th ed. 1984) (Citations omitted).

Unfortunately, all the court is given to divine legislative intent in this instance is a conference report on H.R. 5174[4] and miscellaneous floor remarks of the sponsor of the original bill and his colleagues. Greater weight may be accorded the remarks of the sponsor of the bill. *Id.*

The consumer credit amendments of H.R. 5174 were not altered by the conference committee, and were identical in both the house and senate versions. *Bankr. Serv., Current Awareness Alert* (Lawyers Coop.) 53 (July 1984). The consumer credit amendments contained within Title III of H.R. 5174 are the same as those contained within the earlier H.R. 1800 version, and reference to the remarks of the author of H.R. 1800, Congressman Synar, are especially illuminative of legislative intent. *See* 130 Cong.Rec. H7491 (daily ed. June 29, 1984) statement of Rep. Moorhead) and 130 Cong.Rec. H1810 (daily ed. Mar. 21, 1984) (statement of Rep. Synar). After noting that 250 members of Congress had joined with him in the introduction of H.R. 1800 Rep. Synar declared that:

> Our pending legislation deals in four key areas. First and foremost, it allows the bankruptcy judges the authority to dismiss bankruptcy filings that would otherwise constitute substantial abuse of chapter 7 of the Bankruptcy Code. This power is reserved to the judge only.

130 Cong.Rec. H1810 (daily ed. Mar. 21, 1984).

His stated purpose for introducing the bill was to ensure middle and lower income citizens with needed consumer credit by presumably closing prior loopholes such as stacking state and federal exemptions, discharge of consumer debts by debtors with prospects of substantial future income, and other perceived abuses of the personal liquidation provisions, thereby restoring the

---

3. bankruptcy petition filed by a person whose debts are primarily consumer debts and who has chosen to proceed under chapter 7 rather than chapter 13 must state that he is aware of each form of relief;

4. exemptive provisions have been revised to prevent stacking of federal and state exemptions by husband and wife within a joint petition;

5. eve of bankruptcy purchase of luxury goods and services create debts which are now presumptively nondischargeable; and

6. debtor is required to file a schedule of current income and expenditures which can alert the creditor that debtor is able to repay a reasonable portion of his debt out of future income.

4. The bill which finally added the amendments to the Bankruptcy Code.

confidence of the business community in applicants for consumer credit.[5]

Congressman Brooks echoed the sponsor's concern regarding past abuses of personal liquidation and its consequent pressure to drive up the cost of consumer credit:

> Mr. Chairman, of particular importance in this package of bankruptcy amendments, are those which relate to personal bankruptcies. These reforms, which have been proposed by my good friend Congressman Mike Synar, seek to eliminate the abuse of the bankruptcy system by debtors who are not suffering economic hardship—an abuse which has occurred with alarming frequency in recent years. At the same time, these reforms will retain that relief for those who truly deserve a new start—the people for whom the system is meant to work.
>
> Since 1979, when the present bankruptcy codes were enacted, personal bankruptcies have run 200 percent higher annually than they had in the 12 preceding years.
>
> It has been estimated that as much as $1 billion of debt is unnecessarily discharged annually under the present bankruptcy system. As a result, consumer credit has become expensive and difficult to obtain. Consumers, especially those of middle and lower income groups, are paying dearly for the laxity we have introduced into our bankruptcy laws.

> The personal bankruptcy reforms in this bill represent a balanced and fair approach to correcting this situation. They will go a long way toward curbing the abuses in the system without injuring those who truly deserve help.

130 Con.Rec. H1811–1812 (daily ed. Mar. 21, 1984).

One of the perceived evils is that debts are discharged by chapter debtors who have future income sufficient to meet these obligations:

> Mr. Chairman, for the last couple of years in going home, I have been getting many complaints from owners of small businesses about the large number of persons taking bankruptcy. It was pointed out to me that a number of these persons taking bankruptcy had good jobs. They could pay their obligations, but it was the easier route to go chapter 7 and take bankruptcy and not worry about their debts.
>
> . . . .
>
> H.R. 1800 does not go far enough, but it will make some of these corrections and I certainly support that section of the bill.

*Id.* at H1812 (Statement of Rep. Montgomery).

Another of the sponsors of H.R. 1800 reiterated the theme surrounding the floor debates of H.R. 1800 that debtors, who are easily capable of paying back their debts

---

5. The court does not question the logic of Congressman Synar but gleans his argument from his remarks from the floor:

> Mr. Chairman, 1 year ago I introduced H.R. 1800 because I believed that middle and lower income citizens in this country were being denied needed credit. I firmly believed that moderate changes in the Bankruptcy Code could help restore the confidence in the business community so that these working men and women could improve their lives by the responsible use of credit.
>
> . . . .
>
> I heard all of these people complain about the abuses that we have in the bankruptcy system today. They said that because of these abuses, the costs have risen so high that many of those people in that middle and lower

> bracket have found that credit is unavailable, and what credit is available is too expensive to get.
>
> . . . .
>
> In conclusion, Mr. Chairman, let me say this: Credit is important to America. Credit provides the opportunity for Americans to improve themselves. It is a cornerstone of our economic system, and it will be the cornerstone of whatever economic recovery we have in this country. I believe that the consumer bankruptcy reforms that we have in this bill will go a long way toward reestablishing a balance in our credit system. I say to my friends and fellow colleagues that it is good law, and I commend it to their consideration.

130 Cong.Rec. H1810 (daily ed. Mar. 21, 1984).

without economic hardship, are unnecessarily discharging billions of dollars of debt on an annual basis:

> Mr. Chairman, this is money that could be paid back without hardship to the debtor. Allow me to underline that point. We are talking about billions being discharged that could have been paid back. We are not talking forcing bankrupt individuals to come up with money that they do not have; we are not talking about reducing the positive effect and intention of the bankruptcy law. We are talking about a system that is fair to all and one where debts that are freely undertaken are required to be repaid when the debtor does in fact have the capacity to do so without an undue burden.

> I have compared this unnecessary discharge to shoplifting. The result is the same. The honest consumer is forced to pay a premium for what he or she purchases that includes the cost to the retailer of the loss incurred.

> . . . .

> This is the kind of thing we are talking about. We are not trying to limit the ability of someone from getting a fresh start, that is what the Bankruptcy laws are for and I support that ... The breadth of support for this legislation should assure all Members that this legislation is not a Trojan horse that will frustrate debtors while providing the creditor the power to force the last dollar out of a helpless creditor. There is no criticism of that nature directed at this legislation. This is a good law and is a long overdue law.

*Id.* at H1823.

It follows from the floor debates that due attention must be paid to the future income potential of the debtor to determine to what extent debts may be repaid.

On the issue of substantial abuse of the provisions of chapter 7 the bankruptcy judge should make a determination of whether the debtor could reasonably fund a chapter 13 plan without undue hardship.[6] The comments from the floor following the presentation of the conference report of H.R. 5174 suggest this kind of analysis:[7]

> In 1978, Congress passed the Bankruptcy Reform Act. That act made it easier for a debtor to obtain chapter 7 relief, because it does not require that he give serious consideration to a chapter 13 repayment plan. This has worked to the detriment of creditors and consumers alike. A recent GAO report suggests that 40 percent of those who file for chapter 7 relief have income, assets and debts comparable to those seeking chapter 13 relief. These improper chapter 7 filings may cost the lending industry as much as $1.25 billion annually in lost revenues. And as with anything else, these losses are passed along to consumers in the form of higher interest rates, credit fees, and increased prices for goods and services.

> The Conference Report before us today proposes reasonable guidelines to ensure that a debtor seeks relief under the appropriate chapter of the Bankruptcy Code. It requires the clerk of a bankruptcy court to advise a debtor of both the chapter 7 and chapter 13 forms of relief. A debtor who then enters a chapter 7 filing must attest to having been made aware of his options under both chapters. Furthermore, a bankruptcy court could dismiss a chapter 7 filing if, in its opinion, *the filing constitutes a "substantial abuse" of the Bankruptcy Code because the debtor is found capable of fulfilling the terms of a chapter 13 repayment agreement.*

---

6. See *In re White,* 49 B.R. 869 (Bankr.W.D.N.C. 1985). *See also, In re Reynolds,* 49 B.R. 51 (1985).

7. *See also,* 130 Cong.Rec. Section 5361 (daily ed. Apr. 27, 1983) (Sen. Heflin's comments: "(B)ankruptcy law ... has provided an escape hatch for these overextended debtors, who in the long run could well afford to meet their obligations.")

130 Cong.Rec. H7499 (daily ed. June 29, 1984) (Congressman Anderson) (Emphasis added).

Legislative history suggests that Congress was determined to reduce the number and amount of consumer debts which are annually discharged by debtors who are able to repay a significant portion of their debts, yet continue to guarantee the truly needy a "fresh start." This would serve the ultimate goal of reducing the cost of consumer credit to the lower and middle income recipients who now bear the burden. The truly needy will be given the "fresh start" envisioned by the 1978 Act, yet the abusers will be denied a "head start."

Of necessity our attention is drawn to the future income potential of the debtor in determining whether the use of personal liquidation provisions would constitute the type of substantial abuse which the consumer credit amendments are targeted to prevent. Although this analysis runs counter to the legislative intent as reflected in the history to section 707 of the 1978 Act,[8] it is apparent that congress is pulling in the reins.

Legislative history also indicates that the court should consider whether the debtor is before it due to some unforeseen calamity, such as serious illness, disability or unemployment, or merely filing so that he can get a head start on his creditors after loading up on luxury purchases and living a high lifestyle. The Court does not suggest that only those who suffer calamitous financial reverses can petition the court for relief under chapter 7. Whether the debtor has suffered an unforeseen calamity is certainly a factor to be considered, and it is one of the time-served reasons for petitioning the court for relief.[9]

Nowhere does the Code define "substantial abuse", and the Supreme Court has not yet prescribed rules to implement the practice and procedure under section 707(b).[10]

The court turns to other reported decisions for guidance. The first such reported decision accords the phrase "substantial abuse" its ordinary and plain meaning. *In re Bryant*, 47 B.R. 21, 24 (Bankr.W.D.N.C. 1984). The *Bryant* decision found indicia of substantial abuse of the provisions of chapter 7 within the following circumstances:

1. the debtor did not suffer financial difficulty due to calamity, sickness or unemployment;

2. the debtor disregarded his duty under section 522 to truthfully list all of his obligations, his monthly expenses, and to accurately disclose his general financial position to the court; and

3. the debtor exhibited bad faith by greatly overstating his monthly expenses with the intention of misrepresenting his financial picture.

The same bankruptcy judge declined to dismiss a second section 707(b) case. *In re White*, 49 B.R. 869 (1985). After due consideration of the meaning of the key words

---

**8.** "(Section 707(a) dismissed for cause) does not contemplate ... that the ability of the debtor to repay his debts in whole or part constitutes adequate cause for dismissal. To permit dismissal on that ground would be to enact a non-uniform mandatory chapter 13, in lieu of the remedy of bankruptcy."
S.Rep. No. 989, 95th Cong., 2d Sess. 94, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5880 and H.Rep. No. 595, 95th Cong., 2d Sess. 380, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6336 (Same in both reports).
The amendment to section 707 thwarts this legislative history. Such a reading is supported by other consumer credit amendments:
  1. the debtor must submit a schedule of current income and expenditures, Pub.L. No. 98–353, Section 305(2):

  2. the bankruptcy clerk must apprise the individual with primarily consumer debts of each chapter under which he may proceed, Pub.L. No. 98–353, Section 302;
  3. the attorney of the individual debtor with primarily consumer debts must submit a written declaration or affidavit that he has informed the petitioner that he may proceed under chapter 7 or 13, Pub.L. No. 98–353, Section 322(2).

**9.** *In re Bryant*, 47, 21, 24 (Bankr.W.D.N.C.1984).

**10.** *Pub.L.* No. 98–353, Section 320 and telephone interview with Pat Shannon Esq., Bankr.Div., Jud.Conf. Washington, D.C. (July 3, 1985).

contained within the statute, the court ultimately granted chapter 7 relief to the debtor because the debtor's sole liability, a $400,000 judgment against him in a personal injury suit, was not a consumer debt.

The third reported decision which alludes to the dismissal provision is one in which that issue was raised *sua sponte* within an interesting context. Before the court, *In re Reynolds*, 49 B.R. 51 (1985), was the issue of dischargeability of a personal debt on grounds of procurement by false pretenses and fraud. It was within this context that the court raised the issue of discretionary dismissal for substantial abuse of chapter 7. After finding that the intent of the debtors at the time of procuring the loan only rose to the level of "wishful thinking" and not fraud, the court went on to consider how the creditor would fare if the case was dismissed and the debtors opted to file a chapter 13 plan in its stead. The court concluded that such was not a meaningful option, and declined dismissal.

The Reynolds case raises an interesting question; how is the possibility of substantial abuse to come to the attention of the court? The amendment which adds section 707(b) to the Code requires that the court address the issue of substantial abuse "on its own motion and not at the request or suggestion of any party in interest." [11] *Reynolds* indicates that the issue may come to the attention of the court via a hearing on an exception to dischargeability, and probably, an objection to dischargeability. However, the motion to dismiss on section 707(b) grounds may not be made by any creditor. A creditor is clearly a "party

in interest," and to give effect to the plain meaning of the section there must be no "request or suggestion" made by any creditor to so consider the issue. *See Section 707(b): Some Thoughts On "Substantial Abuse" Dismissal,* Norton Bankr.L.Adviser Jan. 1985, at 8–9. As discussed *supra,* the sister amendment to section 707(b) in which a debtor is now required to file a schedule of current income and current expenditures provides an additional vehicle by which the substantial abuse issue may come to the court's attention.

Another troubling area presented by this new section is how the court is to treat the presumption in favor of granting the relief requested by the debtor.[12] The court is given no guidance on the operation of this presumption and how it affects the burden of going forward with the evidence.[13] The court is cast in a dual role, as the adducer of evidence, as well as the arbiter. The court trusts that the Supreme Court will soon prescribe rules which will address this problem, and provide the bankruptcy courts with sufficient guidance in the performance of this unique role.

■ Until such time as the Supreme Court prescribes the rules, this court will take its guidance from the legislative history surrounding the consumer credit amendments and decisions of other bankruptcy courts. Whether the debtors have a likelihood of sufficient future income to fund a chapter 13 plan which would pay a substantial portion of the claims of the unsecured creditors is one factor. Whether the debtors have exhibited any bad faith in the filing of their petitions and schedules, or

---

**11.** Pub.L. No. 98–353, Section 312(2).

**12.** "There shall be a presumption in favor of granting the relief requested by the debtor." *Id.*

**13.** Rule 301 of the Federal Rules of Evidence states:

(A) presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

The court understands that by the operation of this presumption it must make at least a threshold inquiry of the facts and circumstances surrounding the filing of the chapter 7 petition. Although the rules of statutory construction for the provisions of the Bankruptcy Code indicate that section 707(b) requirement of "notice and hearing" indicate there need only to be an *opportunity* for a hearing, opportunity alone will not suffice. 11 U.S.C. Section 102(1)(A). Without an actual hearing the court would run the risk of reversal for failing to go forward with the evidence.

have engaged in eve of bankruptcy purchases is another factor. Whether the debtors have suffered an unforeseen calamity, or are merely using the chapter 7 provisions to gain relief from past excesses is also a factor.

■ The Code provides no definition of the phrase "substantial abuse," and the meaning is left for judicial interpretation. Key to the analysis is whether the debtor could realistically fund a chapter 13 plan which would pay his creditors a significant portion of their claims. In the instant case, the debtor would be able to pay his unsecured creditors approximately 68 per cent of their claims with a five-year chapter 13 plan, whereas under chapter 7 straight liquidation the unsecured creditors would receive approximately 2¢ on the claim dollar.[14] Findings of Fact 24–25. This projection for plan funding is without regard to future salary increases,[15] the large income tax refunds which the debtors will receive, the collection of child support arrearages owed wife, or wife's employment. Legislative history suggests that the chapter 7 liquidation provisions were designed to give the truly needy a fresh start, not to give those who can afford to meet their obligations a head start. At no point in their recent history have the debtors displayed a sincere resolve to tighten their belts, or to incur debts with a clear intent to pay their creditors their just due. Both schedules of current income and expenses which they have submitted to this court show excesses in the majority of their cost-of-living expenditures.[16] This piling up of cash advances and consumer purchases on their credit cards far in excess of their ability to repay those debts, and their fail-

ure to propose even a reasonable family budget in either of their schedules is evidence of their bad faith. The court will not permit these overextended debtors to use this court as an "escape hatch" when in the long run they can well afford to meet their obligations to a substantial degree.

The issue of the debtors' bad faith is raised in yet another context. The bankruptcy amendments added an additional filing duty to those already required of the debtor:

> The debtor shall—
>
> (1) file a list of creditors, and unless the court orders otherwise, a schedule of assets and liabilities, *a schedule of current income and current expenditures* . . .

11 U.S.C. Section 521(1) (Emphasis added). *See also*, Bankr.R. 1007(b).

All schedules filed with the bankruptcy court must be verified or contain an unsworn declaration of truth pursuant to Rule 1008.[17] The purpose of the rule is to ensure the integrity of the judicial process, and violations are punishable as perjury. *Dickinson v. Wainwright*, 626 F.2d 1184 (5th Cir.1980) (false statement made under unsworn declaration pursuant to 28 U.S.C. Section 1746 is punishable as perjury).

The court relies upon the veracity of the allegations and statements made in the petitions and schedules before it.[18] This is especially true of the new required schedule:

> The amendment to section 521 requiring filing a statement of current income and expenditures compliments the

---

**14.** The funding of the 68 percent is projected without reduction in the amount of the $400.00 monthly payment which Robert Grant sends to his college-aged son.

**15.** The debtor has enjoyed progressive salary increases at the rate of approximately 9 percent per annum since 1982. *See* Findings of Fact 13–14.

**16.** *See* notes 19–24 infra and text accompanying notes.

**17.** All petitions, lists, schedules, statements of financial affairs, statements of executory contracts, Chapter 13 Statements and amendments thereto shall be verified or contain an unsworn declaration as provided in 28 U.S.C. 1746.
Bankr.R. 1008.

**18.** A petition or its schedules made knowingly and fraudulently upon a false oath can subject the debtor to denial of discharge. 11 U.S.C. Section 727(a)(4)(A).

amendment to section 707. It is from this statement that the court may deem whether the debtor will have sufficient income to repay a meaningful part of his debts. If that is the situation, the court may find that use of chapter 7 would constitute a substantial abuse of its provisions.

*4 Collier on Bankruptcy* para. 707.02 (15th ed. 1985).

The debtors' joint petition filed herein on February 7, 1985 is duly sworn as being true and correct, and appended to it is the original Schedule of Current Income and Expenditures.[19] The Schedule shows a net monthly loss of income over expenditures in the sum of $1448.01.

After the court heard the testimony of Robert and Cherry Grant at the May 9th hearing on its section 707(b) motion, it entered a finding that there had been a lack of financial communication between the parties, and that the expenditures projected by the debtors for future living expenses were inaccurate.[20] The court allowed the debtors to file an amended Schedule of Current Income and Expenditures which they did file on May 23, 1985.[21]

The amended schedule contains reductions in several line items, some contingent upon a relocation of the debtors closer to husband's place of employment, and some not. The original schedule includes monthly entertainment expenses of $450.00, and transportation expenses of $890.00 (includes cost of operation of 1982 Mercedes 240D); the amended schedule includes transportation expenses of $580.00.[22] Although the court applauds the thrift of Mr. Grant in surrendering the 1982 Mercedes 240D to the leasing company, it must question the good faith of the debtor in acquiring two 1985 leased vehicles in exchange, a 1985 Nissan and a 1985 Cutlass Sierra. The monthly rental cost of these

**19.** This schedule is not verified, nor does it contain an unsworn declaration pursuant to 28 U.S.C. section 1746:

SCHEDULE OF CURRENT INCOME AND CURRENT EXPENDITURES (Filed Feb. 7, 1985)

INCOME

| | |
|---|---|
| Husband or Debtor's monthly take home pay | $ 3358.00 |
| Wife's monthly take home pay | $ |
| Other monthly income (specify) | $ |
| TOTAL | $ 3358.00 |

EXPENDITURES

| | |
|---|---|
| Rent or home mortgage payment (include lot rental for mobile home) | $ 900.00 |
| Utilities (Electric 100 Heat 140 Water 35 Telephone 200) | $ 495.00 |
| Food | $ 700.00 |
| Clothing | $ 500.00 |
| Laundry and Cleaning | $ 65.00 |
| Newspapers, periodicals and books (including school books) | $ 35.00 |
| Medical and drug expenses | $ 55.00 |
| Insurance (not deducted from wages) Auto | $ |
| Other House and car | $ 450.00 |

EXPENDITURES

| | | |
|---|---|---|
| Transportation | | $ 400.00 |
| Other | | $ |
| Recreation | | $ 450.00 |
| Dues, union, professional, social or otherwise (not deducted from wages) | | $ |
| Taxes (not deducted from wages) | | $ 150.00 |
| Alimony, maintenance, or support payments | | $ |
| Other payments for support or dependents not living at home | | $ 400.00 |
| Religious and other charitable contributions | | $ 17.00 |
| Other (specify) | cable TV $ 25.00 car lease 490.01 | $ 515.01 |
| TOTAL | | $ 5806.01 |

EXCESS OF CURRENT INCOME OVER CURRENT EXPENDITURES $ (1448.01)

**20.** Excesses in the monthly expenditures are readily apparent:
1. telephone, $220.00;
2. food for a family of four, $700.00;
3. transportation, $400.00, and car lease, $490.01;
4. recreation, $450.00; and
5. clothing, $550.00

**21.** Order of May 21, 1985.

**22.** *See supra* note 1.

two vehicles equals that of the Mercedes.[23] Furthermore, Mrs. Grant is not employed, and the court questions whether she has daily need for a vehicle of her own. Certainly this is not the post-petition, belt-tightening budget which a debtor who has newly wiped the slate clean of debts should propose to cure past excesses; such free-wheeling spending is likely to put the debtor in need of additional relief after several years.

The question of what monthly living expenses are excessive is one with which the court has great familiarity. It is called upon weekly to review chapter 13 plans for their feasibility. It is also a determination which can be made from common knowledge and experience.

The debtors will have gross income for 1985 in the sum of $65,000.00. In addition, they will receive income tax refunds in the sum of $5,319.20. This income level puts the Grant household in at least the top 10 percentile of all Midwest households.[24] Mr. Grant is apparently quite competent in his profession, and has enjoyed salary increases of approximately 9 percent per annum. It is not unlikely that he will continue in this upward trend.

The listed monthly expenditure for food is also overstated. On the original schedule the cost of food is set at $700.00; on the amended schedule it is listed at $625.00. However, even the second budget is high when compared to regional standards for food costs for a family with two children. A low-level budget for the Midwest would yield $293.00 per four week period,[25] a moderate level budget would yield $368.00, and a liberal level $433.25. The Grants scheduled expenditures for clothing, utilities, transportation, recreation and miscellaneous [26] also suffer from the same excesses.[27]

Both Robert and Cherry Grant testified to making costly purchases of clothing—a $700 men's suit from Saks Fifth Avenue, and $2100 in women's clothing from an exclusive dress shop. The Grants' Christmases must be quite an extravaganza; Robert Grant testified that the $9,000 loan of November, 1983 from Joe Huggins was primarily for Christmas items. Curious, as well, is Robert Grant's practice of sending by U.S. Mail $400 in cash each month to his son who is attending college out-of-state.

This bankruptcy judge does not take lightly the burden imposed upon the Court by 11 U.S.C. § 707(b) as said duties would dictate the Court impose a standard of living upon the debtors which could cause

**23.** Actually, the debtor netted a monthly savings of 1¢.

**24.** Generally accepted national statistics are not available for any more refined category than those with "income of $50,000 and over." Those households in the Midwest in 1983 with gross income of $50,000 and over (the highest category) are in the top 9.3 percentile; median household income is $21,068 per annum. Bureau of Census, U.S. Dept. of Commerce, *Statistical Abstract of the United States 1985* 443 (105th ed. 1984). A "household" comprises "all persons who occupy a 'housing unit', that is, a home, an apartment or other group of rooms". *Id.* at 4. Those families earning $50,000 and over in 1983 nationally are in the top 12.6 percentile; the national 1983 median income for all families is $24,580.00. *Id.* at 446. A "family" is defined as "a group of 2 or more persons related by birth, marriage or adoption and residing together in a household." *Id.* at 4.

**25.** *Id.* at 480 (adult couple with 2 children aged 12–19 years). *See supra* note 1 and accompanying text.

**26.** Specific items included within the monthly "other expenses" are:
1. child allowances, $45.00 for son and $20.00 for daughter;
2. Christmas expenses prorated at $125.00 per month, or $1500.00 per annum; and
3. miscellaneous gifts for children and employees of $25.00.

**27.** *See supra* note 1. The average monthly cost of energy consumption for an 1800 sq. ft. house in Akron, Ohio for 1984 was $143.82; the cost of residential telephone service assuming customer owns instrument and including federal excise tax for Akron, Ohio in 1984 was $15.40 per month; and the monthly cost for home delivery of daily and Sunday newspaper was $8.70. Am. Chamber of Com.Researchers Ass'n., *Inter-City Cost of Living Index* Section 3, pp. 10 and 16 (1st qtr. 1985). Compare the same items of monthly expenditures as listed on the debtors' amended schedule: electric and heat, $200.00 per month; telephone, $50.00 per month; and newspapers, periodicals and books $35.00.

unforeseen hardships especially with the lack of guidance in the broad power given to the Court. However, it appears to this Court that the failure of the debtors to realistically and accurately list their monthly expenditures on the schedule filed on February 7, 1985 and the subsequent overstatement of reasonable monthly expenses on the second schedule filed on May 23, 1985, and then their subsequent incurring of expenses as indicated by leasing two 1985 cars and the extravagant expenses incurred for consumer items within 180 days or less of the filing of their bankruptcy petition and the accumulation of other consumer debts within the two year period of filing in the approximate sum of $28,000, the Court is compelled to conclude that to grant the debtors a discharge of these and an additional $37,000 of unsecured debts would give them a "headstart" in the race for conspicuous consumption and its concomitant status at the expense of their deserving creditors.

Therefore, the Court concludes that the joint petition for Chapter 7 relief herein filed by Robert and Cherry Grant is dismissed as this Court has concluded that the granting of relief would be a substantial abuse of 11 U.S.C. Chapter 7 of the Bankruptcy Code.