**In re Nancy A. SHANDS, Debtor.**

**Bankruptcy No. 85–09168.**

United States Bankruptcy Court,
E.D. Michigan, N.D.

Sept. 18, 1985.

Robert P. Denton, Saginaw, Mich., for debtor.

Allan C. Schmid, Saginaw, Mich., for Raymond Fowler.

### MEMORANDUM OPINION REGARDING § 707(b) DISMISSAL

ARTHUR J. SPECTOR, Bankruptcy Judge.

Nancy A. Shands filed a voluntary petition for relief in Chapter 7 on April 2, 1985. When reviewing the file in preparation for a pre-trial conference in an adversary proceeding (A.P. No. 85–9039) brought by the debtor's ex-husband, Raymond Fowler, we observed some unusual facts which caused us to set the case for a § 707(b) "substantial abuse" hearing. We invited parties in interest to intervene. Not surprisingly, Mr. Fowler's attorney accepted the invitation. At the hearing, the following facts were elicited from the debtor.

Mrs. Shands has been employed for almost nine years at Saginaw Steering Gear, a division of General Motors Corporation. According to her statement of affairs, her 1984 earnings were approximately $30,000. At the time she filed this case she was on sick leave, as she was then eight months pregnant with twins. In addition, her doctor had informed her that she would need surgery for an undisclosed ailment soon after delivery; as a consequence, she was unsure when she would be medically cleared to return to work. However, things worked out better than she expected, because she returned to full time employment on July 3, 1985. Mrs. Shands

earns $11.12 per hour on a 40–hour shift. Her gross pay is $414.00 per week. She claims that her net pay is only $196.00 per week, because, besides taxes and union dues, she has a voluntary wage assignment of $80.00 per week deducted from her paycheck and mailed to her credit union in payment of a pre-petition unsecured debt. She is also entitled to $40.00 per week from Mr. Fowler as child support; he is not only current on that obligation, according to the Friend of the Court who monitors these payments, he is paid ahead. Her present husband also works at Steering Gear and presumably earns an equivalent amount. Thus, the family's gross income may well approach or exceed $60,000 per year. This is a second marriage, and by agreement, the spouses split living expenses fifty-fifty. They rent an apartment for $300.00 per month. At the time the bankruptcy was filed, the debtor's share of the household expenses were $1,046.00, and her monthly income was listed at $1,064.00, consisting of $800.00 per month sick pay and $264.00 per month child support. Among her share of monthly expenses are $60.00 for recreation, $258.00 for food, $50.00 for clothing and $208.00 for laundry and cleaning (which includes rental payments on a washer, dryer, stove and refrigerator).

On December 27, 1984, Mr. and Mrs. Shands borrowed approximately $19,000 from the Wanigas Federal Credit Union to pay all of their outstanding bills except her old utility bill to Consumers Power Company, in order to consolidate their debt into one payment. This new debt is being paid by a wage assignment out of Mr. Shands' paycheck alone. When they did this, Mrs. Shands did not anticipate filing bankruptcy. However, shortly after they obtained the debt consolidation loan, she received a demand from her ex-husband for payment of about $6,000.00[1] which he claimed was due him from their divorce judgment. Only then did she consult an attorney.

Shortly after the 90th day after the various debts were paid, the Chapter 7 petition was filed. Mrs. Shands listed one secured creditor, GMAC, which held a lien on her 1982 Chevrolet to the extent of $2,829.83. She reaffirmed this indebtedness on April 15, 1985 and is paying $141.92 per month to GMAC, or approximately $33.00 per week. She also listed five unsecured creditors:

| Creditor | Nature of Debt | Amount |
| --- | --- | --- |
| Ray Fowler | divorce settlement | $ 12,000.00 |
| Wanigas Federal Credit Union | personal loan | 3,000.00 [2] |
| Consumers Power Company | utility service | 272.00 [3] |
| Citibank-Visa | misc. charges | 1,400.00 |
| Montgomery Ward Company | notification purposes | 1.00 [4] |

Of these, the Visa card and the Montgomery Wards charge account are in her husband's name and he is making all of the payments on a current basis; she merely used the cards with his permission. In addition, as stated above, she is voluntarily paying Wanigas Federal Credit Union $80.00 per week on the pre-petition personal loan indebtedness. As a result, Mr. Fowler and Consumers Power Company are the only creditors not being paid. Mrs. Shands explains that she does not intend to pay Consumers Power because the bill was for services provided to a mobile home she no longer owns; she therefore feels no obligation to pay it. She also claims that since her husband was given a lien on the marital home and since she lost that home to a mortgage foreclosure, she no longer has an obligation to him. She feels she lost more as a result of the foreclosure than he did and that he should just accept his loss silently. Finally, she claims to be unable to pay him what is owing. She did, however,

---

**1.** As Mr. Fowler failed to file a proof of claim, we do not know precisely how much he believes his claim to be. Strangely, however, despite indications that Mr. Fowler seeks only about $6,000, the debtor listed this claim in Schedule A–3 at $12,000.

**2.** The credit union filed two unsecured claims in this case: one for $3,339.11 and another for $366.44 for a total of $3,705.55.

**3.** Consumers Power Company filed a proof of unsecured claim in the amount of $475.03.

**4.** Neither Citibank nor Montgomery Wards filed a proof of claim.

offer him $1,000 in full settlement of his claim pre-petition, which he refused. In her answer to Mr. Fowler's complaint (in the adversary proceeding) she stated: "The Debtor does admit that the main purpose of filing her bankruptcy was to discharge her debt to her former husband."

Mrs. Shands explained that since she has now paid off the "rental" payments, and therefore now owns all but one of her appliances, for which she is still paying $14.70 per week (or approximately $63.21 per month) against a balance of approximately $200.00, she now has an additional monthly disposable income of $144.79 ($208.00 minus $63.21) that she did not have when she first filed the bankruptcy. This coming December, that $14.70 per week will also drop off. However, she claims additional expenses for the care of her baby twins. She estimates these at about $50.00 per week for a babysitter, $11.50 per week for diapers and $30.00 per week for formula and baby food. This equates to slightly less than $400.00 extra per month. Thus, her expenses have increased about $250.00 per month over those she listed at the inception of the case. Reconstructing the debtor's financial situation from the testimony and schedules, we determine that the debtor's current financial situation is as follows. Her net weekly pay before her voluntary repayment of pre-petition debt is $276.00 ($196.00 + $80.00). Her ex-husband pays her an additional $40.00 per week for child support. Based on 52 weeks per year divided by 12 months per year, her net income per month is $1,369.33 ($276.00 + $40.00 × 52 weeks ÷ 12 months = $1,369.33) without overtime. Taking her statement of expenses at face value, her share of current monthly expenses is $1,301.12 ($1,046.00 as scheduled − $144.79 [reduction in rental payments] + $400.00 [infant care expenses]), leaving her disposable income of $68.21 per month. However, we note that, as her share of monthly expenses constitutes only one-half the true household expenses, her household apparently spends: (a) $516.00 per month for food plus the $120.00 per month for baby food and formula for a total of

$636.00 per month for food; (b) $100.00 per month for clothing; and (c) $120.00 per month for recreation. While we cannot say that these figures are absolutely ridiculous, *compare In re Grant*, 13 B.C.D. 303, 51 B.R. 385 (N.D.Ohio 1985), we can easily see where with just a little effort, sufficient savings can be effected to fund a full payment Chapter 13 plan. If the debtor really had only $68.21 of income available to pay pre-petition debts, we would be extremely hesitant to declare that her use of Chapter 7 offended our sensibilities. However, the figures here simply do not reflect the realities of the debtor's case.

Section 521(1) of the Bankruptcy Code requires the debtor to file "a schedule of current income and current expenditures". The form is similar to the budget prepared for Chapter 13 cases with the exception that it does not require a disclosure of the debtor's spouse's income. Therefore, we are unable to determine exactly how much the debtor's household income really is. What we do know, however, is that she is voluntarily paying $488.59 per month ($80.00 per week to Credit Union × 52 weeks ÷ 12 months + $141.92 to GMAC) to her favored creditors, Wanigas Federal Credit Union and GMAC, even though we calculated from her schedules and testimony that since the birth of the twins, the debtor's income exceeds her expenses by only $68.21 per month. This is a case where actions speak louder than words. Her voluntary payment of approximately $113.00 per week shows that the debtor feels that she has the ability to pay at least that amount on her debts. We accept that representation as true. Her choice not to file Chapter 13, then, was not occasioned by her inability to afford repayment, but strictly by some personal motive. Mr. Fowler, in his complaint, described it as "spite". All of the foregoing, and especially the facts that all creditors other than Consumer Power's small claim and Mr. Fowler's substantial claim will be and are being paid in full, and that the debtor has admitted that her "main purpose" in filing bankruptcy was to discharge the debt due

**124**

Mr. Fowler, convinces us that spite was indeed the motivating force in this bankruptcy.

 If the debtor were to have filed a Chapter 13 instead of a Chapter 7, and pledged to her trustee the $113.00 per week she is now paying only two creditors, she would be able to pay all of her debts (excluding the Visa and Montgomery Wards bills which are her husband's) within 33 months.

| | |
|---|---|
| $ 2,829.83 | GMAC |
| $ 3,705.55 | Credit Union |
| $ 6,000.00 | Fowler |
| $   475.03 | Consumers Power |
| $13,010.41 | TOTAL |
| + $ 1,301.04 | Trustee's 10% on receipts |
| $14,311.45 | Total Payments into plan to yield 100% |

$14,311.45 ÷ $113.00 per week = 127 weeks

127 weeks ÷ 4.3 weeks per month = 29.5 months [5]

Although we do not subscribe to Judge Abrams' general rule that when a debtor has an ability to pay 100% of his or her debts within a three year period, use of Chapter 7 constitutes substantial abuse *per se*, *In re Edwards*, 13 B.C.D. 250, 50 B.R. 933 (Bankr.S.D.N.Y.1985), and we certainly cannot agree with Judge White's view that an ability to pay 68% of one's debts over five years warrants a dismissal for substantial abuse of Chapter 7, *In re Grant, supra,* we believe that an ability to pay 100% within three years when coupled with some egregious circumstance is sufficient to trigger such action. Here we find that the debtor's intent to file bankruptcy "against her ex-husband", as it were, is an egregious circumstance which, coupled with her conceded ability to pay $113.00 per week for debt service, constitutes a substantial abuse of Chapter 7. Accordingly, we will contemporaneously herewith enter an order dismissing this case under § 707(b).

---

**5.** Although we calculate that the debtor's income exceeds her expenses by $68.21, we did not apply that amount to the theoretical payment of her debts via Chapter 13. Had we done so, it is obvious that all of her debts could be paid off even sooner. Alternatively, if the debtor had wished to stretch the payments out in a 36–month plan, the weekly pledge would be $91.74 ($14,311.45 + 156 weeks = $91.74), a mere $11.74 more per week than she is now having withheld from her pay in favor of the Credit Union.