**In re Joseph V. VESNESKY and Karen S. Vesnesky, Debtors.**

**Bankruptcy No. 88–1184.**
**Motion No. 88–6637.**

United States Bankruptcy Court,
W.D. Pennsylvania.

June 11, 1990.

Stephen M. Goldring, Kathleen Robb–Singer, Office of the United States Trustee, W.D.Pa., Pittsburgh, Pa., for U.S. trustee.

Joseph Colavecchi, Colavecchi & Ryan, Clearfield, Pa., for debtors.

James R. Walsh, Spence, Custer, Saylor, Wolfe & Rose, Johnstown, Pa., trustee.

## MEMORANDUM OPINION

JOSEPH L. COSETTI, Bankruptcy Judge.

The United States Trustee moves for dismissal of the bankruptcy case pursuant to section 707(b) of the Bankruptcy Code, 11 U.S.C. § 707(b). After pretrial hearings and argument, this matter now comes before the court on cross motions of the parties for summary judgment, pursuant to Bankruptcy Rules 7056 and 9014. For the following reasons, this court grants the motion of the United States Trustee, and revokes the discharge of the debtors.

This court previously held in *In re Andrus*, 94 B.R. 76 (Bankr.W.D.Pa.1988) that an ability to pay a substantial portion of consumer debts, with some indicia of bad faith, justifies denial of a discharge and dismissal of a chapter 7 case pursuant to section 707(b) of the Bankruptcy Code. In this case, the court holds that the ability to make significant payments to creditors, absent significant mitigating factors, constitutes sufficient grounds for dismissal pursuant to section 707(b). In such circumstances, the absence of bad faith is irrelevant. To the extent possible, the criteria for dismissal for substantial abuse pursuant to section 707(b) in this opinion shall be the standard this court applies to future cases.

### I. *Facts*

Joseph V. Vesnesky and Karen S. Vesnesky (the "debtors") filed a joint voluntary petition under Chapter 7 of the Bankruptcy Code on April 29, 1988. As required in all cases, the petition was accompanied by a statement of financial affairs, schedules of assets and liabilities, and a schedule of current income and current expenditures. All were verified by both debtors through their execution of an unsworn declaration under penalty of perjury.

The statement of financial affairs disclosed that both debtors are presently employed in secure positions as school teachers in public schools. The debtors have disclosed combined income of $44,617 for the year of 1986 and $52,906 for the year of 1987. In their second revised schedule of current income, the debtors list combined gross income of $4,778 per month or $57,336 per year. There is no evidence or allegation that the debtors have reached their maximum levels of advancement with their current employers.

In the original schedule of current expenditures, the debtors claimed monthly expenditures in the amount of $3,250.23. However, included among the monthly expenditures were payments on thirteen prepetition obligations. These payments totalled $1,821 per month, or fifty-five percent of the debtors' after tax income. Ob-

viously, such expenditures would disappear if the chapter 7 discharge would be permitted to stand.

After the United States Trustee began its inquiry, the debtors twice amended their schedule of current expenditures. Post-petition payments on pre-petition unsecured claims have been voluntarily deleted, but the debtors now claim that other expenses have increased. The court examines the amendments carefully; the inquiry of the United States Trustee should not provide an incentive for the debtor to discover new expenses.

The repeated amendments illustrate the circumstances of the debtors, to their detriment. The amended expense items fail to reflect any economic hardship of the debtors. The debtors live in a lightly populated area of Western Pennsylvania in which the cost of living is low. However, since the filing the debtors have increased their total housing costs from $351 per month to $716.47, including real estate taxes and household repairs. This increase occurred because the debtors consented to foreclosure and entered into an agreement with relatives to rent a house with an option to purchase. The housing expense appears high.

Similarly, the debtors do not list expenses related to illness or calamity. Rather, the debtors have added new expenses, such as babysitting expenses, in their amended schedule of expenditures. This babysitting expense is likely to diminish within two years when the youngest child reaches school age; however, it is real now. The amended expense list also contains a highly questionable reserve of $150 per month for unexpected expenses, though no illness or calamity is averred. Additionally, under "installment payments," the debtors have included: "estimated payment on replacement of automobiles: $550.00," and "estimated monthly payments on washer, dryer and furniture: $110.00." The amended schedule of expenditures contemplates a comfortable lifestyle and does not reflect any hardship.

## II. The Purpose of Section 707(b)—An Examination of Legislative History

In 1984, Congress passed a series of amendments to the Bankruptcy Code known as the Bankruptcy Amendments and Federal Judgeship Act of 1984. Included in these amendments was subsection (b) of section 707, which provides as follows:

After a notice and a hearing, the court on its own motion or on a motion by the United States Trustee but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. § 707(b).

One commentator suggests that section 707(b) was added to the Bankruptcy Code in response to concerns that some debtors who could pay their creditors might resort to chapter 7 to avoid their obligations. 4 *Collier on Bankruptcy* para. 707.04 (15th ed. 1989). However, section 707(b) lacks usual legislative history. The only such legislative history that exists is in the form of statements from the congressional floor. From that, this court infers that section 707(b) was intended to address the debtor's ability to pay. Congresswoman Roukema addressed this problem in her floor statements as follows:

[E]conomic conditions cannot account for the high number of debtors who have chosen to discharge all their debt in a straight chapter 7 bankruptcy when they could have completed repayment of such debts under chapter 13....

The changes incorporated in H.R. 5174 are badly needed and will go a long way toward curbing the increasing number of unnecessary chapter 7 straight bankruptcy filings....

130 Cong.Rec. H1808 (daily ed. Mar. 21, 1984). *See also* 130 Cong.Rec. H7499 (daily ed. June 29, 1984) (Statement of Congressman Anderson) ("[A] bankruptcy court could dismiss a chapter 7 filing if, in

its opinion, the filing constitutes a 'substantial abuse' of the Bankruptcy Code because the debtor is found capable of fulfilling the terms of a chapter 13 repayment agreement.") One bankruptcy court has concluded that "[I]t follows from the floor debates that due attention must be paid to the future income potential of the debtor to determine to what extent debts may be repaid." *In re Grant*, 51 B.R. 385, 391 (Bankr.N.D.Ohio 1985). *But see In re Keniston*, 85 B.R. 202, 218 (Bankr.D.N.H. 1988) ("One thing that is *not* ambiguous is that Congress did defeat the attempt to impose a threshold future income test as a qualification for chapter 7 relief for consumer debtors.") As stated above, however, this court concludes that the ability to significantly repay creditors from future income may justify dismissal for substantial abuse pursuant to section 707(b). The court will use the ability to significantly repay creditors as a starting point in the analysis of dismissal for substantial abuse in this case and all future cases.

### III. *Judicial Interpretation of Section 707(b)*

Under section 707(b), dismissal is warranted only upon a finding of "primarily consumer debts" and only if chapter 7 relief would constitute "substantial abuse." Neither the Code itself, nor the legislative history, adequately define either of these prerequisites to section 707(b) dismissal. The following consideration of judicial interpretation of these provisions will help give shape to the necessary outcome of this case.

### A. "Primarily Consumer Debts"

Consumer debt is defined in the Code as debt incurred by an individual for a personal, family, or household purpose. 11 U.S.C. § 101(7) (1978). Some courts have been faced with the issue of whether debts secured by real property are included in this definition. The debtors in *In re Kelly*, 841 F.2d 908 (9th Cir.1988), argued that debts secured by real property are never consumer debts. The debtors relied on a floor statement made by Senator DeConcini prior to the enactment of the 1978 Act in which he states that "[A] consumer debt does not include a debt to any extent the debt is secured by real property." 124 Cong.Rec. 32,393 (1978).

The Ninth Circuit, however, rejected a reliance on such statements, holding that the Code's language was clear and precisely addressed the issue. Using the Code's definitional section, the court found "debt" to mean "liability on a claim," and "claim" to mean any "right to payment, whether or not such right is ... secured, or unsecured." *In re Kelly*, 841 F.2d at 912.

The court in *Kelly* then went on to interpret "primarily" for section 707(b) purposes. Here, the court relied on the dictionary definition of "primarily," meaning "for the most part." Thus, when more than half of the dollar amount owed is consumer debt, the statutory threshold is passed. *In re Kelly*, 841 F.2d at 913. After having first admitted in this matter that the debt is consumer debt, the debtors have later attempted to argue that credit card advances and loans were used to pay a mortgage. Under *Kelly*, the distinction makes no difference.

In an earlier opinion prior to the Ninth Circuit's decision in *Kelly*, the Bankruptcy Court for the Western District of North Carolina concluded that Congress intended to leave the definition of "primarily consumer debts" to bankruptcy judges in light of the facts and circumstances of each case. *In re Bryant*, 47 B.R. 21 (Bankr.W. D.N.C.1984). In *Bryant*, the debtor's attorney argued that a debtor "has primarily consumer debts if and only if the aggregate amount of the Debtor's consumer debts exceeds the amount of his nonconsumer debts." *Id.* at 26.

The *Bryant* court refused to take such a narrow stance: "Certainly the relative aggregate amounts of consumer versus nonconsumer debts are important considerations, but they are by no means the only way by which a court can find a case to involve 'primarily consumer debts.'" *Id.* at 26. The court concluded that a debtor's obligations may be adjudged "primarily consumer debts" not only by the aggregate amount but also by their relative number.

Another method of distinguishing consumer debt from nonconsumer debt is a

profit motive analysis. The test is derived from the legislative history of section 101(7) that indicates that the definition of consumer debt is derived from its use in various consumer protection laws. *In re Booth*, 858 F.2d 1051 (5th Cir.1988). The *Booth* court analyzed consumer debt in conjunction with the Truth in Lending Act, which indicates that when a credit transaction involves a profit motive, it is outside the definition of consumer credit. *Id.* at 1055. Therefore, the Fifth Circuit analyzed the debtor's debts by asking whether they were incurred with an eye toward profit.

The *Kelly* court's inclusion of real estate mortgages and the *Booth* court's instructions to look to the profit motive are approaches which can be readily harmonized. The decisions require a flexible and rather expansive approach to the definition of "primarily" consumer debt.

B. "Substantial Abuse"

The majority of judicial interpretation of section 707(b) has centered on the meaning of "substantial abuse." The term has no definition and no cross-reference in the Code. The lack of legislative direction has led courts to employ the dictionary definition of "abuse" and "substantial." *In re Edwards*, 50 B.R. 933 (Bankr.S.D.N.Y. 1985). Another court reasons that the words "substantial abuse" should be given their ordinary and plain meaning. *In re Bryant*, 47 B.R. 21. These definitions fail to define the parameters by which a debtor's action will warrant a dismissal of the chapter 7 petition. Some critics fear that a very narrow reading of 707(b) could transform the section into a mandatory chapter 13. Black and Herbert, *A Critique of the 1984 Consumer Credit Amendments to the Bankruptcy Code.* 19 U.Rich.L.Rev. 845, 858 (1985).

The court in *Kelly* found that the debtors' ability to repay their debts, standing alone, justified dismissal. The circuit judges cited an extensive list of bankruptcy case law which also concluded that the principal factor to be considered in determining substantial abuse is the debtor's ability to repay the debts for which a discharge is sought. *In re Kelly*, 841 F.2d at 913. The *Kelly* court cited the final Committee Report on the 1984 amendments, which states that dismissal for substantial abuse is intended to uphold creditors' interests in obtaining repayment, and that "if a debtor can meet his debts without difficulty as they become due, use of chapter 7 would represent a substantial abuse." *Id.* at 914, *citing*, S.Rep. No. 65, 98th Cong., 1st Sess. 53, 54 (1983).

Combining the debtors' excess income of $440 per month and half of their $500 monthly expenditure for recreation (found to be excessive), the *Kelly* court determined that the debtors could pay about 99% of their unsecured debt in only three years. *In re Kelly*, 841 F.2d 908, 915.

In determining ability to pay, more courts since *Kelly* have looked to the debtor's ability to fund a chapter 13 plan. *In re Walton*, 866 F.2d 981 (8th Cir.1989). The Court of Appeals for the Eighth Circuit in *Walton* concluded that courts may consider the future income of a debtor in giving meaning to the substantial abuse standard. In *Walton*, the United States District Court for the Eastern District of Missouri affirmed the dismissal of a chapter 7 petition solely because of the debtor's ability to propose a workable chapter 13 plan.

On appeal to the Eighth Circuit, the debtor argued that dismissal on the above stated grounds was "forcing" him into chapter 13. This, he claimed, conflicted with the express will of Congress that no one can be forced into chapter 13. The debtor also argued that "substantial abuse" meant nothing more than bad faith. The *Walton* court recognized that the court may always consider the petitioner's good faith and unique hardships under section 707(b). However, imposing a good faith requirement to this section would needlessly duplicate other provisions in the Code that require petitioners to file in good faith. *In re Walton*, 866 F.2d at 983. In addition, the court expressly stated its intention to follow the Ninth Circuit's decision in *Kelly* that if a debtor is able to pay his debts, a conclusion of substantial abuse may be found. *Id.* at 985, *cf. In re Herbst*, 95 B.R.

98 (Bankr.W.D.Wis.1988); *In re Strong*, 84 B.R. 541 (Bankr.N.D.Ind.1988). *But see In re Cecil*, 71 B.R. 730 (Bankr.W.D.Va.1987); *In re Deaton*, 65 B.R. 663 (Bankr.S.D.Ohio 1986).

Not all courts have followed the Ninth Circuit's expansive view of substantial abuse. A second line of cases utilizes a test of "totality of the circumstances." These cases are illustrated by the opinion of the Bankruptcy Court for the District of Minnesota in the case of *In re Wegner*, 91 B.R. 854 (Bankr.D.Minn.1988). In *Wegner*, Chief Judge Kressel took a more narrow and restrictive view of the application of section 707(b). The court held that the ability to pay creditors was not in and of itself sufficient to establish abuse. Instead, the *Wegner* decision held that courts must look to a totality of circumstances, rather than to a single indicia of ability to pay.

A few decisions, while recognizing ability to repay debts as one factor in a section 707(b) hearing, have also ruled that this factor must be coupled with other factors to constitute "substantial abuse" within the appropriate meaning of the statute. *In re Deaton*, 65 B.R. at 665. According to this line of interpretation, the following factors should be reviewed in determining whether there is substantial abuse:

1. Whether the debtors have a likelihood of sufficient future income to fund a chapter 13 plan which would pay a substantial portion of unsecured claims.

2. Whether the debtors' petition was filed as a consequence of illness, disability, unemployment or some other calamity.

3. Whether the schedules suggest the debtors incurred cash advancements and consumer purchases in excess of their ability to repay them.

4. Whether the debtors' proposed family budget is excessive or extravagant.

5. Whether the debtors' Statement of Income and Expenses is representative of their true financial condition. *In re Grant*, 51 B.R. at 392; *In re Bryant*, 47 B.R. at 24.

The Court of Appeals for the Sixth Circuit most recently has followed this multi-factor approach in analyzing the totality of the debtor's circumstances, and finding a substantial abuse. *In re Krohn*, 886 F.2d 123 (6th Cir.1988); *see also In re White*, 49 B.R. 869 (Bankr.W.D.N.C.1985). The above-stated decisional factors are not necessarily inconsistent with the holdings of *Walton* and *Kelly*, however. Any difference between the courts seems to be a question of degree. As the Eighth Circuit stated in *Walton*, the bankruptcy court may always consider unique hardships. In this connection, it must be emphasized that the language of section 707(b) is permissive: "[T]he court *may* dismiss a case filed by an individual debtor...." Even though the ability to pay is the critical question, the court may use its discretion to recognize unique hardship. It must also be emphasized that section 707(b) declares the "presumption in favor of granting the relief requested by the debtor."

### III. *The Debtors' Ability to Pay Creditors in This Case Requires Dismissal*

Applying the above criteria to the facts of this case, the court concludes that granting the debtors a discharge would be a substantial abuse of the Bankruptcy Code. First, assuming all of the debtors' allegations and admissions in this case to be true, it cannot be questioned that the listed debts were primarily consumer debts. Second, it is clear to this court that the debtors have the ability to repay a substantial portion of their debts. The debtors originally asserted monthly expenditures of $1,821, or 55% of their after tax income, for pre-petition obligation. Those expenditures must be disallowed in the consideration of the debtors' ability to pay. When challenged by the United States Trustee, the debtors deleted those payments, but increased their other scheduled expenditures and added additional expenditures for projected expense.

The schedule of expenditures contains additional projections which are not allowable in determining the debtors' ability to pay. The debtors request that this court consider the purchase of a new house, new automobiles, and new furniture and appliances, before any consideration is

given to payment of pre-petition unsecured creditors. The debtors mask their ability to pay creditors behind a series of new expected purchases.

The debtors make much in this case of what they perceive as their relative lack of material possessions. Clearly, however, they do have future income ability. We believe the statute strongly urges an income-based and not an asset-based analysis.

This court dislikes the thought of policing the lifestyle of debtors. However, under section 707(b), it believes that the statute requires the court to review not the detail but the totality of these choices.

In this case, unsecured claims totalling $35,741.07 have been listed. Even if this court would later find all other expenses to be allowable, and even find the reserve for emergencies to be appropriate under the circumstances, the debtors are nonetheless able to make substantial payments to unsecured creditors. The elimination of the two saving accounts described as expenses above, together with the difference between income and expenses as shown by the amended statement, could result in a monthly chapter 13 plan payment of $818. After contributions to the chapter 13 fee and expense fund, unsecured creditors would receive seventy-five percent of all filed claims in amounts listed.

## V. *Conclusion*

In summary, the court holds that the debtors are able to repay a significant portion of their unsecured debt in a chapter 13 plan. Because the court has not found any mitigating circumstances, the court concludes that granting a discharge to the debtors constitutes substantial abuse of the Bankruptcy Code, pursuant to 11 U.S.C. § 707(b). The discharge of the debtors, inadvertently granted shall be revoked. If the debtors do not move for conversion to chapter 13 within 30 days, this case shall be dismissed.

An appropriate Order will issue.