In re Gabriel BACCO, Debtor.

UNITED STATES TRUSTEE, Movant,

v.

Gabriel BACCO, Respondent.

Motion No. 93–1746M.
Bankruptcy No. 93–22265–BM.

United States Bankruptcy Court,
W.D. Pennsylvania.

Nov. 4, 1993.

Kathleen Robb–Singer, Office of United States Trustee, Pittsburgh, PA.

Candice D. Holsinger, Hyatt Legal Services, Monroeville, PA, debtor.

Carl P. Izzo, Jr., Greensburg, PA, Chapter 7 Trustee.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

The United States Trustee has moved (at Motion No. 93–1746M) to dismiss debtor's

chapter 7 bankruptcy petition pursuant to 11 U.S.C. § 707(b). According to the United States Trustee, it would be a substantial abuse of the provisions of chapter 7 to grant debtor relief because he has the ability to fund a plan of reorganization which would result in a substantial distribution to his unsecured creditors. The United States Trustee estimates that a proper utilization of debtor's income could result in a sixty-four percent (64%) payout over thirty-six (36) months and a one hundred percent (100%) payout over five (5) years.

Debtor opposes the motion. He denies that he has such ability and argues that conversion to one of the chapters where reorganization is contemplated would impair his "fresh start" without appreciably benefitting his creditors.

Debtor's bankruptcy petition will be dismissed pursuant to 11 U.S.C. § 707(b) unless he requests conversion to either chapter 11 or chapter 13 within ten (10) days and submits therewith a proposed plan which makes substantial distribution to all creditors.

–I–

FACTS

Debtor filed a voluntary chapter 7 petition on June 28, 1993. The summary of schedules attached to the petition when it was filed indicates that debtor had interests in real and personal property valued at $229,081.50 and owed $275,654.39 to secured creditors and $22,180.75 to general unsecured creditors. The summary further indicates that the combined net monthly income of debtor and his wife is $3,087.63 while their monthly expenditures total $3,063.71.[1]

Schedule A, Real Property, indicates that debtor and his wife, who is not a debtor in this court, jointly own their marital residence as tenants by the entirety. The declared value of the property is $73,500.00.

Schedule B, Personal Property, lists assets with a declared value of $155,581.50. Among the assets listed on Schedule B were the following:

| Description of Firearm | Declared Value |
|---|---|
| Krieghoff K–80 (# 20952) | $ 33,000.00 |
| Krieghoff Gold Bulino (# 20952) | 26,000.00 |
| Krieghoff K–80 (# 14347) | 13,815.00 |
| Krieghoff K–80 (# 20334) | 6,986.00 |
| Perazzi MX8 (# 77616) | 6,000.00 |
| Total: | $ 85,801.00 |

Debtor's penchant for expensive possessions was not limited to firearms. He also owned several vintage and new automobiles. Schedule B also listed the following vehicles:

| Description of Vehicle | Declared Value |
|---|---|
| 1967 Chevy Nova | $ 4,000.00 |
| 1970 Chevy El Camino | 6,000.00 |
| 1971 Buick Riviera | 4,000.00 |
| 1992 Chevy Truck | 18,000.00 |
| 1993 Chevy Corvette | 35,000.00 |
| Total: | $ 67,000.00 |

Except for the 1967 Chevy Nova, in which debtor's wife had a joint interest, debtor was the sole owner of these vehicles.

With one relatively minor exception, all of the debt listed on Schedule D, Creditors Holding Secured Claims, pertains to debt incurred in purchasing the above firearms, several of the above automobiles, and in purchasing and "improving" debtor's residence.

The following secured debt was incurred in purchasing the above firearms:

| Description of Firearm | Amount of Debt |
|---|---|
| Krieghoff Gold Bulino (# 20949) | $ 29,141.54 |
| Krieghoff K–80 (# 20951) | 34,985.97 |
| Krieghoff K–80 (# 14347) | 14,441.00 |
| Krieghoff K–80 (# 20334) | 7,500.00 |
| Perazzi MX8 (# 77616) | 7,000.00 |
| Trapgun | 2,220.00 |
| Total: | $ 95,288.51 |

Secured debt totalling $83,000.00 also was incurred in purchasing the following vehicles:

| Description of Vehicle | Amount of Debt |
|---|---|
| 1971 Buick Riviera | $ 6,000.00 |
| 1992 Chevy Truck | 32,000.00 |
| 1993 Chevy Corvette | 45,000.00 |
| Total: | $ 83,000.00[2] |

---

1. We note that debtor deducts union dues in his budget, thereby reducing sums available for a plan of reorganization. We also note his pay stubs indicate a zero deduction for union dues but include a voluntary deduction for the cost of a car phone. These inconsistencies are noted but play no part in this decision.

2. The amount of secured debt owed on the 1992 Chevy Truck and 1993 Chevy Corvette exceeds their declared value. Debtor customarily purchased new vehicles every two years and "rolled over" the unpaid balance owed on the prior vehicle into the loan for the purchase of the new vehicle.

The following secured debt also was incurred by debtor in purchasing and ostensibly improving his residence:

| | |
|---|---|
| Mortgage | $ 48,000.00 |
| Home Improvement Loan | 35,000.00 |
| Home Improvement Loan | 7,000.00 |
| Home Equity Loan | 7,385.88 |
| **Total:** | **$ 97,385.88** |

Schedule D, Creditors Holding Unsecured Nonpriority Claims, lists debt in the amount of $22,180.76. The entire amount was incurred for purchases of consumer goods and for home improvements.

Schedule H, Codebtors, indicates that Louis Bacco, debtor's father, is codebtor on a loan from Irwin Bank, the holder of the mortgage on debtor's residence.

Debtor has been employed for the past twenty-five years by Bacco Transit Lines, Inc., which is owned by his father. His gross income for 1992 was approximately $37,000.00. Debtor's wife is unemployed and receives $880.00 per month in worker's compensation.

Schedule J, Current Expenditures Of Individual Debtors, indicates monthly expenses of $3,063.71. These expenses are "joint" expenses—i.e., for the upkeep of debtor and his wife. The following entries of note appear on Schedule J:

| | |
|---|---|
| Home Mortgage Payment | $ 869.71 |
| Auto Insurance | 154.00 |
| Auto Installment Payments | 1,251.00 |
| (1992 Chevy Truck and 1993 Chevy Corvette) | |

Debtor attested, under penalty of perjury, that the schedules and statements attached to his bankruptcy petition were "true and correct to the best of … [his] knowledge, information, and belief" by affixing his signature thereto.

Also attached to the bankruptcy petition was a document captioned "Chapter 7 Individual Debtor's Statement Of Intention", wherein debtor declared his intention to surrender the following firearms to secured creditors:

Krieghoff Gold Bulino (# 20949)

Krieghoff K–80 (# 20951)

A chapter 7 trustee was appointed on June 29, 1993, the day after debtor filed a bankruptcy petition. On July 30, 1993, a § 341 first meeting of creditors occurred, wherein the trustee inquired of the debtor, *inter alia,* as to the accuracy of the schedules. Again debtor swore under penalty of perjury as to the truthfulness and accuracy of the schedules.

On September 15, 1993, the chapter 7 trustee reported that no assets were available from the bankruptcy estate for distribution to creditors. On September 23, 1993, after conferring with the chapter 7 trustee, the United States Trustee brought the present motion to dismiss debtor's bankruptcy pursuant to 11 U.S.C. § 707(b). According to the United States Trustee, granting debtor relief under chapter 7 would be a substantial abuse of the provisions of chapter 7. If the above monthly automobile payments of $1,251.00 were completely or partially "deleted", the United States Trustee argues, debtor would have sufficient disposable income to fund a chapter 13 plan which would pay general unsecured creditors some 64% of the amount of their claims over a 36–month period.

Debtor responded to the United States Trustee's motion on October 15, 1993. He denies that total or partial deletion of the above automobile payments would result in sufficient disposable income to fund a chapter 13 plan. Also, he argues that surrendering the two automobiles would deprive him of a "fresh start" and would not result in a significant benefit to his creditors.

That same day, debtor also requested leave to amend Schedules B, D, F, and J. The net effect of the proposed amendments is to decrease the declared value of debtor's personal property from $155,581.50 to $54,020.00; to decrease the amount of secured debt from $275,654.39 to $195,506.42; and to increase the amount of general unsecured debt from $22,180.75 to $99,249.27.

Debtor proposes amending Schedule B in several respects. Certain firearms listed on the original schedule and valued at $95,268.51 have been deleted. According to debtor, the following firearms were stolen from his automobile on February 21, 1993, some 117 days prior to the execution of the original schedules and some 127 days prior to the bankruptcy filing:

*Description of Firearm*

Krieghoff Gold Bulino (# 20947)

Krieghoff K–80 (# 14347)

Krieghoff K–80 (# 20334)

Perazzi MX8 (# 77616)

The police report, which was not filed until two days after the alleged theft, asserts that the firearms were stolen from the back seat of a locked automobile while debtor was at-tending a gun show. The police report does not indicate any damage to the motor vehicle and states that upon returning the debtor found the vehicle unlocked. One is left to wonder whether Houdini has returned from the grave and taken up a life of crime.[3]

Debtor also proposed on the amended Schedule B to decrease by $15,760.00 the declared values of the vehicles he owned:

| Description of Vehicle | Original Declared Value | Amended Declared Value |
|---|---|---|
| 1967 Chevy Nova | $ 4,000.00 | $ 1,200.00 |
| 1970 Chevy El Camino | 6,000.00 | 2,900.00 |
| 1971 Buick Riviera | 4,000.00 | 1,190.00 |
| 1992 Chevy Truck | 18,000.00 | 15,500.00 |
| 1993 Chevy Corvette | 35,000.00 | 30,450.00 |
| Totals: | $ 67,000.00 | $ 51,240.00 |

Debtor also proposes amending Schedule D in several respects. He proposes deleting the entire secured debt of $98,268.51 owed for the firearms. The amount due and owing for "home improvements" was increased by $2,120.54 from $97,385.88 to $99,506.42. Also, the amounts due and owing on the 1992 Chevy truck and 1993 Chevy Corvette were increased by $13,000.00 from $83,000.00 to $96,000.00.

Debtor proposes amending Schedule F by adding the following unsecured debt:

| Description of Firearm | Amount of Debt |
|---|---|
| Krieghoff Gold Bulino (# 20949) | $ 29,141.54 |
| Krieghoff K–80 (# 14347) | 14,441.00 |
| Krieghoff K–80 (# 20334) | 7,500.00 |
| Krieghoff K–80 (# 20951) | 1,985.57 |
| Perazzi MX8 (# 77616) | 24,000.00 |
| Total: | $ 77,068.11 |

Finally, debtor also proposes amending Schedule J to reflect an increase in monthly expenses from $3,063.71 to $3,812.80.[4] Debt-or has increased monthly mortgage pay-ments by $206.00 from $869.71 to $1,075.71. The total payments on vehicles has increased by $537.13 from $1,251.00 to $1,788.13. In addition to paying $1,251.00 per month on the 1992 Chevy truck and 1993 Chevy Cor-vette, debtor allegedly pays $270.57 per month for the 1971 Buick Riviera and $266.56 per month for the 1970 Chevy El Camino. Also added to amended Schedule F is $25.00 per month in medical and dental expenses and $30.96 per month in "local taxes".

A hearing on the United States Trustee's motion to dismiss was held on October 26, 1993.

–II–

## ANALYSIS

11 U.S.C. § 707(b) provides as follows:

(b) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the re-quest or suggestion of any party in inter-est, may dismiss a case filed by an individ-ual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in

---

**3.** The Krieghoff K–80 (# 20951) also has been deleted from the amended version of Schedule B. As has been noted, debtor had declared his inten-tion to surrender this and another firearm to a secured creditor.

Coincidentally, the guns debtor intended to surrender were not stolen. The guns debtor in-tended to keep and pay for were the only guns stolen. If the property securing the debt is no longer available, debtor argues, then the debt becomes unsecured and therefore dischargeable.

**4.** The total stated on the amended version of Schedule J does not agree with the sum of the individual entries. If the latter are accurate, the total is $3,862.80 rather than $3,812.80.

favor of granting relief requested by the debtor.

■ This provision is one of several consumer credit amendments to the Bankruptcy Code enacted in response to pressure from retailers and consumer lenders who complained of an ever-increasing number of chapter 7 filings by non-needy debtors. See *In re Green*, 934 F.2d 568, 570 (4th Cir.1991). Congress intended when it enacted Section 707(b) to deny relief under chapter 7 to dishonest or non-needy debtors. See *In re Walton*, 866 F.2d 981, 983 (8th Cir.1989). A creditor's interest in obtaining repayment should be upheld where such payment would not impose an undue burden on the debtor. See *In re Kelly*, 841 F.2d 908, 914 (9th Cir.1988).

■ Section 707(b) empowers the bankruptcy court to deal in equitable fashion with an unscrupulous debtor who enlists the aid of the court in a scheme to take unfair advantage of creditors. It gives fair warning to those who are "tempted by unprincipled accumulation of consumer debt" that they must deal with their creditors in a fair and honorable way. See *In re Krohn*, 886 F.2d 123, 126 (6th Cir.1989).

■ Dismissal because of "substantial abuse" can be based either upon debtor's lack of honesty or upon debtor's lack of need. See *In re Krohn*, 886 F.2d at 126.

■ A determination as to substantial abuse must be made on a case-by-case basis and depends on the totality of the circumstances. See *In re Green*, 934 F.2d at 572 (citations omitted). The following factors may be especially salient in arriving at such a determination:

(1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

(2) whether debtor made consumer purchases far in excess of his ability to repay;

(3) whether debtor's proposed family budget is excessive or unreasonable;

(4) whether debtor's schedules and statements of current income and expenditures reasonably and accurately reflect debtor's true financial condition; and

(5) whether the bankruptcy petition was filed in bad faith.

See *In re Green*, 934 F.2d at 572.

■ The circumstances surrounding this bankruptcy case overwhelmingly indicate that granting debtor relief would be a substantial (if not egregious) abuse of the provisions of chapter 7. We are not convinced of debtor's honesty or of his need for relief. To the contrary, debtor desires to enjoy luxuries and desires that his creditors pay for same.

### A) *Reason For Bankruptcy Filing*

The schedules and statements submitted in this case dispel any notion that debtor filed for bankruptcy because of some misfortune such as illness or disability. Although debtor's wife allegedly is disabled, none of the scheduled debts is for medical expenses. Moreover, debtor's proposed amended Schedule J asserts that he presently spends only $25.00 per month for medical and dental needs.

The bankruptcy filing also is not due to debtor's unemployment. According to the schedules and statements, debtor has been employed for the past twenty-five (25) years by a transit company owned by his father and earned in excess of $35,000.00 per year in 1991 and 1992.

### B) *Ability To Repay Consumer Debts*

The reason debtor filed for bankruptcy is obvious: he had made several consumer[5] purchases which he was unable to afford. Debtor was living an extravagant lifestyle disproportionate to his ability to pay and at the expense of his creditors.

During the three-year period prior to filing for bankruptcy, debtor purchased several expensive firearms costing in excess of $95,000.00; purchased several motor vehicles costing $83,000.00; and incurred several home equity loans in excess of $97,000.00. Debtor obviously knew that his annual income of approximately $36,000.00 was not sufficient to pay these debts on the dates they were incurred.

5. Debtor has conceded that all of the debt he has incurred is "consumer" debt.

### C) *Debtor's Current Monthly Expenditures*

Debtor's proposed monthly budget, as reflected in Schedule J, is unreasonable. Several scheduled entries are grossly unreasonable in light of surrounding circumstances. For instance, debtor indicates on the original Schedule J that he spends $869.71 per month and indicates on the proposed amended Schedule J that he spends $1,075.21 per month on mortgage/home improvement loan payments. This amounts to twenty-eight percent (28%) to thirty-five percent (35%) of debtor's monthly net income. Such a large expenditure is unreasonable in this case, especially because debtor's father also is liable for a considerable portion of this debt. Debtor in effect is relieving his father of a debt his father also owes at the expense of debtor's other creditors.

The proposed monthly budget also is unreasonable in another respect. Debtor indicates on the original Schedule J that he spends $1,251.00 per month in installment payments for the 1992 Chevy truck and 1993 Chevy Corvette plus $154.00 per month in auto insurance. In the proposed amended Schedule J, debtor has increased the amount of monthly automobile installment payment by $537.13 to $1,788.13 to reflect payments for the 1970 Chevy El Camino and the 1971 Buick Riviera. These expenditures constitute forty-five percent (45%) to sixty-three percent (63%) of debtor's total monthly budget.

As has been noted, the chapter 7 trustee reported that no estate assets are available for distribution to general unsecured creditors. It boggles the mind that debtor is spending this much of his budget so that he and his wife may travel in luxury while proposing to pay nothing to general unsecured creditors.

A substantial portion of the above mortgage and auto installment payments could (and should) be dedicated to paying debtor's creditors.

### D) *Accuracy Of Schedules And Statements*

At the very least, the court is not confident that the schedules and statements as submitted accurately depict debtor's financial condition. As has been noted, the required schedules and statements were attached to the bankruptcy petition when it was filed. Thereafter debtor swore to their accuracy at the first meeting of creditors. Subsequent to the United States Trustee's motion to dismiss, debtor sought to submit amended Schedules B, D, F, and J.

The specific changes reflected in the amended schedules were discussed at considerable length previously. The apparent intended effect of these amendments is to rebut the United States Trustee's contention that debtor could pay his creditors (in a plan of reorganization) a considerable percentage of what they are owed if he would "tighten his belt" and reduce monthly expenditures. If the case is converted to a chapter 13 proceeding, debtor argues, he will be deprived of a "fresh start" and will be able to pay general unsecured creditors only four percent (4%) of what they are owed.

The most significant changes in debtor's financial condition as depicted in the proposed amended schedules are attributable to the alleged theft from debtor's automobile of firearms allegedly worth $58,082.54. According to debtor, the firearms were stolen from his parked vehicle while he was attending a gun show on February 21, 1993. This allegation is "curious", to say the least, in several respects.

Debtor did not report the theft to police until February 23, 1993, two days after the theft occurred. The court is left to wonder why debtor would wait so long to report such an incident.

According to the police report, the firearms were stolen from the back seat of debtor's automobile, where they were left in plain view in gun cases, while debtor attended a gun show. It defies belief that one would leave firearms of such value in plain view of passers-by at a gun show.

Finally, and perhaps most importantly, the alleged theft occurred some four months before debtor filed for bankruptcy on June 28, 1993. No plausible explanation was offered for why the theft was not reflected in the original schedules. Absent an explanation,

the court is left to wonder whether the schedules submitted accurately reflect debtor's financial condition.

### E) *Bad Faith*

The present bankruptcy petition unquestionably was filed in bad faith. Debtor seeks to maintain his extravagant lifestyle and to receive a discharge while intending to pay nothing to general unsecured creditors. In so doing, debtor has sought to enlist the aid of the court in a blatant scheme to take unfair advantage of creditors. It would be unconscionable for this debtor to reap the benefits of his uncontrolled spending by retaining everything he so acquired while his unsecured creditors are made to go away empty-handed. This case is a paradigm of the type of abusive filing that Section 707(b) was enacted to counteract.

Were this court's discretion unfettered, it would dismiss debtor's bankruptcy petition outright. The court recognizes, however, that its discretion is constrained by the Bankruptcy Code and is particularly mindful of the admonition of Section 707(b) that "[t]here shall be a presumption in favor of granting the relief requested by the debtor".

As has been indicated, there is ample reason to believe that debtor could "tighten his belt" and fund a chapter 11 or chapter 13 plan which would provide for substantial distribution to all of his creditors. Accordingly, debtor's bankruptcy petition will be dismissed unless debtor formally requests conversion to a chapter 11 or a chapter 13 proceeding within ten (10) days. If conversion does occur, debtor will be expected to pay unsecured creditors substantially more than the distribution of four percent (4%) which he suggested in his response to the United States Trustee's motion to dismiss.

An appropriate order shall be issued.