In re Gilbert H. DUNCAN, III, Debtor.

UNITED STATES TRUSTEE, Movant,

v.

Gilbert H. DUNCAN, III, Respondent.

Bankruptcy No. 96–20872–MBM.
Motion No. 96–2033M.

United States Bankruptcy Court,
W.D. Pennsylvania.

Oct. 23, 1996.

Kathleen Robb, Pittsburgh, PA, for Office of the U.S. Trustee.

Robert O. Lampl, Pittsburgh, PA, for Gilbert H. Duncan, III.

### MEMORANDUM OPINION

M. BRUCE McCULLOUGH, Bankruptcy Judge.

This opinion is issued in response to, and subsequent to the hearing on August 13, 1996 regarding, the motion of the U.S. Trustee requesting that respondent's Chapter 7 case be dismissed pursuant to 11 U.S.C. § 707(b). The U.S. Trustee asserts that dismissal is appropriate in this case because respondent's debts are primarily consumer debts and a discharge would constitute a substantial abuse of the Chapter 7 process. Respondent, who commenced this case on February 22, 1996, opposes such dismissal and asserts in support thereof primarily that the U.S. Trustee's analysis of his circumstances is flawed. Respondent also argues that, because a dismissal of his Chapter 7 case would effectively *force* him to seek relief by filing a

subsequent Chapter 13 petition, this Court's granting of the U.S. Trustee's motion to dismiss would be tantamount to the commencement of an involuntary Chapter 13 case against respondent, which is prohibited by 11 U.S.C. § 303(a). Furthermore, respondent asserts that his rights under the Thirteenth Amendment to the United States Constitution, which generally prohibits involuntary servitude, will have been violated if this Court grants the U.S. Trustee's motion to dismiss. For the following reasons, this Court rejects the arguments of respondent.

### STATEMENT OF FACTS

This Court finds the facts pertinent to a resolution of this matter from the various bankruptcy schedules of respondent (some of which are also attached as Exhibits 1–8 of the U.S. Trustee's motion) and respondent's affidavit filed with this Court on August 23, 1996, as well as Exhibits A–E attached thereto (hereafter respondent's Exhibits A–E). Respondent's Schedule F, which is seven pages in length, sets forth thirty-three (33) separate unsecured nonpriority claims totaling $224,080.95. Included among these claims are joint debts of respondent and his nondebtor wife in the amount of $179,847.19. Respondent lists "Consumer Goods" as the consideration received for each of these thirty-three (33) claims. The U.S. Trustee asserts that these claims were incurred, in part, from respondent's usage of over twenty (20) different credit cards.[1] Although 1995 is indicated as the date that all of these claims were incurred, respondent asserts (a) that most of each claim was incurred during periods prior to 1995, and (b) that 1995 was only listed in order to indicate that small portions were incurred during that year. Respondent concedes in Exhibit B to his response to the U.S. Trustee's instant motion that he actually incurred new unsecured indebtedness of $14,697.93 during 1995.

Respondent's Exhibit D, which is a document that was used by a credit counseling service whose aid respondent apparently sought in November 1993, lists the total indebtedness of himself and his wife at that time as $492,685.63. This figure includes outstanding indebtedness secured by existing mortgages on real property jointly owned by respondent and his wife as tenants by the entirety. According to respondent's Schedule A, this real property, which is his principal residence, is presently valued at $375,000.00 and is encumbered with mortgages presently totaling $351,487.82. In two pieces of correspondence to creditors dated May 10, 1993 and April 19, 1993, which were submitted by respondent as Exhibits B and C to his affidavit, respondent asserted that this realty was "conservatively" valued as of July 1992 at $483,000.00 ("and $500,000.00 would not be unrealistic"). Other than this parcel of real property, the only other assets with any value that respondent owns are $12,000.00 in household goods and furnishings as set forth in his Schedule B.[2] As indicated in his Schedule C, respondent proposes to exempt all of his realty and personalty pursuant to 11 U.S.C. § 522(b)(2) (ie., exemptions available under federal nonbankruptcy law other than 11 U.S.C. § 522(d), exemptions available under Pennsylvania state law, and any interest of respondent as a tenant by the entirety "to the extent that such interest as a tenant by the entirety ... is exempt from process under applicable nonbankruptcy law").

Respondent, as indicated in his Statement of Intention filed with this Court, intends to reaffirm the debts that are secured by the mortgages encumbering his residence. In Schedule J, respondent lists a monthly mortgage payment for his residence of $4,550.00. This figure includes property insurance but does not include real estate taxes. Respondent also lists therein an average monthly heating/electricity utility expenditure of $500.00. In Schedule I respondent lists his average monthly net income (ie., net of payroll deductions) as $3,750.00 and that of his

---

1. A perusal of the names of the listed creditors on Schedule F seems to confirm this assertion of the U.S. Trustee.

2. Respondent's Schedule B actually lists only $2,000 in household goods and furnishings. However, respondent asserts that this value was the result of a typographical error and that the true value is $12,000.

wife as $2,450.00, for a combined family net income of $6,200.00. According to respondent's affidavit, he lost his job with Xerox Corporation in December 1993 and was then unemployed for the ensuing nine months. The salary that he presently earns is approximately 75 percent of that which he indicates that he had earned prior to his termination from Xerox.[3] His 1994 federal income tax return sets forth a pension payout of $187,-888.41 from his retirement plan with Xerox. That tax return also indicates an adjusted gross income for respondent and his wife of $265,559.13. Respondent's 1993 and 1995 federal income tax returns respectively set forth adjusted gross incomes for himself and his wife of $112,034.66 and $100,213.76.

Respondent states in his Schedule I that neither himself nor his wife have any dependents. Respondent also indicates the same on his joint 1994 and 1995 federal income tax returns. Respondent, in his affidavit, nevertheless discloses that four of his children, apparently all adult, and two grandchildren presently reside with him and his wife. However, he asserts that only one of these additional household members is presently employed and able to contribute to the household's welfare. Respondent also states in his affidavit that he no longer has the financial support of his sister, brother, mother, and grandmother, all of whom had apparently resided with him and his wife at various times in the past and had then contributed funds that were used to defray certain of the household's expenses.

### DISCUSSION

 1 U.S.C. § 707(b) provides that:

After notice and a hearing,[4] the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C.A. § 707(b) (West 1993). Respondent does not assert that any of the claims scheduled in his case are other than consumer debts, which is wise given that (a) his mortgages are on his residence, thus rendering them "consumer" in nature under this Court's view of 11 U.S.C. § 101(8), which defines " 'consumer debt' ... [as a] debt incurred by an individual primarily for a personal, family, or household purpose," 11 U.S.C.A. § 101(8) (West 1993); see also In re Kelly, 841 F.2d 908, 912 (9th Cir.1988) (the language of the Bankruptcy Code makes clear that a debt is consumer in nature regardless of whether it is secured by realty), and (b) he admits in his Schedule F that his unsecured nonpriority indebtedness is entirely consumer in nature. Thus, the only issue regarding the applicability of § 707(b) to respondent's circumstances is whether this Court finds that respondent's receipt of a Chapter 7 discharge from $224,080.95 in general unsecured indebtedness would constitute "a substantial abuse" of the Chapter 7 bankruptcy process.

### I. The Meaning of "Substantial Abuse" under § 707(b).

"Substantial abuse" is not defined either in § 707 or elsewhere in the Bankruptcy Code. However, the legislative history seems to

---

3. In his Schedule I respondent lists his present salary at $5,000.00 monthly, or $60,000.00 annually. In his affidavit he claims that he had earned $80,000.00 annually while he was at Xerox. Thus, his present salary is exactly 75% of the salary that he had earned while he was at Xerox.

4. A motion to dismiss a debtor's case pursuant to § 707(b) constitutes a contested matter and is, therefore, governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure (FRBP). FRBP Rule 1017(e) also sets forth pertinent procedural rules for such a matter. The Court is of the view that all of these procedural rules have been complied with in light of (a) the hearing on August 13, 1996, which followed notice to respondent, and (b) this Court's direction to respondent to file an affidavit and supporting attachments regarding his unsecured indebtedness.

make clear that § 707(b) "was added to chapter 7 in response to concerns that some debtors who could pay their creditors might resort to chapter 7 to avoid their obligations." 4 *Collier on Bankruptcy*, para. 707.04 at 707–15 (Bender 1996) (citing numerous floor statements of Congressmen at note 4); *see also* S.Rep. No. 65, 98th Cong., 1st Sess. 53, 54 (1983), *reprinted in Norton Bankruptcy Law and Practice 2d*, 1995–96 Ed., at 711–12 (The "Senate Report accompanying § 445, Omnibus Bankruptcy Improvements Act of 1983, which was a forerunner to the Bankruptcy Amendments Act of 1984," indicates that "if a debtor can meet his debts without difficulty as they come due, use of Chapter 7 would represent a *substantial abuse* "). Largely on the basis of such legislative history, courts have uniformly held that a debtor's ability to repay his debts or, more aptly, to fund a Chapter 13 plan is, at a minimum, a factor or circumstance that is indicative of whether "substantial abuse" would result from a discharge. *See, e.g., Kelly*, 841 F.2d at 913; *In re Walton*, 866 F.2d 981, 985 (8th Cir.1989); *In re Krohn*, 886 F.2d 123, 126 (6th Cir.1988); *In re Green*, 934 F.2d 568, 572 (4th Cir.1991). The only difference among the courts seems to be in the importance which they attach to a debtor's future ability to repay its dischargeable debts. *Id.* However, this Court agrees with the court in *In re Vesnesky*, 115 B.R. 843 (Bankr.W.D.Pa.1990), that "[a]ny difference between the courts seems to be a question of degree." *Id.* at 848; *see also In re Ontiveros*, 198 B.R. 284, 288 note 7 (C.D.Ill. 1996) ("all three lines of authorities are not all that divergent").

The Eighth and Ninth Circuits have held that a finding that a debtor is able to repay his debts in the future, without more, is sufficient to dismiss that debtor's Chapter 7 case. *Kelly*, 841 F.2d at 913; *Walton*, 866 F.2d at 985. The Fourth Circuit has held that a debtor's future ability to repay his debts is but one of perhaps six or more factors that must be considered in addressing the substantial abuse issue, and that none of these factors by themselves may be disposi-

tive of such issue. *Green*, 934 F.2d at 572. The other factors to be considered in what has been described as the "totality of the circumstances" test include:

(1) Whether the [debtor's] bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment [on his part];

(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

(3) Whether the debtor's proposed family budget is excessive or unreasonable;

(4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition [of the debtor]; and

(5) Whether the [debtor's] petition was filed in good faith.

*Id.*

■ The Sixth Circuit has held that "[s]ubstantial abuse can be predicated upon either [a] lack of honesty [by the debtor] or [a debtor's] want of need [for a Chapter 7 discharge]," *Krohn*, 886 F.2d at 126, and that these two benchmarks necessitate a consideration of, *inter alia*, all of the factors listed by the Fourth Circuit in *Green*. *Id.* at 126–27. In particular, the Sixth Circuit grouped factors for consideration as follows:

[F]actors that may be relevant to ascertaining a debtor's honesty … [include] the debtor's good faith and candor in filing schedules and other documents, whether he has engaged in 'eve of bankruptcy purchases,' and whether he was forced into Chapter 7 by unforeseen or catastrophic events. Among the factors to be considered in deciding whether a debtor is needy is his ability to repay his debts out of future earnings…. Other factors relevant to need include whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial pre-

dicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities.

*Id.* The difference between the approach of the Sixth Circuit and that of the Fourth Circuit, however, is that a finding that a debtor is not in need of a Chapter 7 discharge (ie., that a debtor has the ability to repay his debts out of his future income), by itself, may be sufficient to warrant a dismissal. *Id.* at 126. Likewise, a finding that the debtor has displayed a lack of honesty also may, by itself, result in a dismissal of that debtor's case. *Id.* The Sixth Circuit's approach thus represents a much more limited version of the "totality of the circumstances" approach, *Ontiveros,* 198 B.R. at 288, and has been referred to by other courts and various commentators as a "hybrid" approach that carves out a position somewhere between the extremes of the Eighth and Ninth Circuits, on the one hand, and the Fourth Circuit, on the other. *Id.* at 288–89. Courts in the Seventh and Tenth Circuits have also recently dealt with the issue of "substantial abuse" under § 707(b). *See, e.g., Ontiveros,* 198 B.R. at 289 (adopting the Sixth Circuit's "hybrid" approach); *In re Higuera,* 199 B.R. 196, 198–201 (Bankr.W.D.Okla.1996) (adopting the Fourth Circuit's "totality of the circumstances" approach).

This Court finds that the Sixth Circuit's "hybrid" approach is the most reflective of congressional intent as evidenced by the legislative history, and that it is also more equitable than the other two approaches. *See also Ontiveros,* 198 B.R. at 291 ("The hybrid approach ... best resolves the tension between the conflicting policies of granting the debtor a fresh start while thwarting the abuse of consumer credit."). Therefore, this Court adopts the "hybrid" approach set forth in *Krohn.* The Court also views its adoption of the "hybrid" approach as consistent with the test set forth in *Vesnesky,* a decision also decided by a bankruptcy court in the Western District of Pennsylvania, wherein that court indicated that "[e]ven though the abili-

ty to pay [in the future] is the critical question, the court may use its discretion to recognize unique hardship." *Vesnesky,* 115 B.R. at 848 (the *Vesnesky* court equates recognition of such hardship with the Fourth and Sixth Circuits' consideration of certain of the numerous additional factors that they list).

## II. *Application of the Hybrid Approach in this Case.*

### A. *Whether respondent is in need of a Chapter 7 discharge?*

■ This Court believes that whether respondent is "needy" may be resolved by focusing primarily upon whether he has the ability to repay his unsecured debts out of future earnings and/or whether he is eligible for adjustment of such debts through Chapter 13 of the Bankruptcy Code. *Krohn,* 886 F.2d at 126.

The Court notes at the outset that respondent and his nondebtor wife both presently enjoy a stable source of income, and that both have been gainfully employed in the past for all but a period of approximately nine months in 1994 when respondent was unemployed. Respondent states that the combined monthly net income for himself and his wife is presently $6,200.00. Because the bulk, if not all, of respondent's monthly expenditures set forth in his Schedule J are costs of his household rather than just for himself, the Court will consider both spouses' income in assessing whether respondent will have sufficient funds in the future to repay at least a portion of his unsecured indebtedness. *Matter of Strong,* 84 B.R. 541, 543 (Bankr. N.D.Ind.1988); *In re Berndt,* 127 B.R. 222, 225 (Bankr.D.N.D.1991) ("in calculating whether there is discretionary income available to fund a [Chapter 13] plan one must, of necessity, observe to what degree a debtor's daily living expenses are shared as co-obligations of the nondebtor spouse").

■ In assessing respondent's future ability to repay at least a portion of his unsecured debts, the Court shall also determine "whether ... [respondent's monthly]

expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *Krohn,* 886 F.2d at 127; *see also In re Bacco,* 160 B.R. 283, 289 (Bankr.W.D.Pa.1993) (mortgage/home improvement loan payments that total 28 to 35 percent of debtor's monthly net income, and car payments that constitute 45 to 63 percent of such income, are unreasonable); *In re Wilson,* 125 B.R. 742, 746 (W.D.Mich.1990) ("the bankruptcy court correctly reduced debtor's monthly expenses" such that the debtor could "repay 32 percent of her unsecured debt"). The U.S. Trustee asserts that respondent's budgeted monthly household expenditures of $4,550.00 for his home mortgage payment and $500.00 for electricity/heating are items that are ripe for adjustment, and that they should be drastically reduced by this Court in its assessment of respondent's financial circumstances. The Court wholeheartedly agrees with this contention, finding unreasonable respondent's proposal to set aside approximately 89 percent[5] of his household's net income for payment of a home mortgage debt and one related utility payment while simultaneously seeking to remove from his ledger $224,-080.95 in general unsecured indebtedness. Such a proposal "is morally and legally unconscionable ... [because it would allow respondent] to extinguish his obligations without first making a *reasonable* effort to fulfill them." *In re Hudson,* 56 B.R. 415, 419 (Bankr.N.D.Ohio 1985) (emphasis added). Although the U.S. Trustee did not indicate in its motion what it felt would represent a reasonable outlay for a home mortgage payment and related utilities, this Court is quite certain that respondent's figure could be *conservatively* adjusted downward by up to 50 to 60 percent, or set at approximately $2,000–2,500, without depriving him, his wife, and the remainder of his present household of adequate shelter. The savings from this adjustment alone could total up to $109,800.00 over a three-year span,[6] which is generally the maximum period for repayment in a Chapter 13 plan.[7] Moreover, these savings, when combined with the realization of any equity that exists in the residence, might enable respondent to satisfy practically all of his outstanding unsecured indebtedness.[8]

Respondent naturally disagrees with this Court's analysis, citing as reasons for such disagreement that (a) he and his wife must support six other individuals although none of these individuals are technically their dependents, (b) his household could not obtain at this time more reasonably-priced accommodations if he were to divest himself of his present residence, (c) he cannot unilaterally sell or abandon his residence and thereby divest himself of the corresponding mortgage

---

**5.** The *sum of the home mortgage payment* ($4,550.00) and electricity/heating payment (500.00) is $5,050.00. This amount divided by respondent's household's net income ($6,200.00) yields approximately 81.5%. However, the Court notes that this percentage is actually understated because, according to respondent's Schedule J, his mortgage payment amount of $4,550.00 is net of accompanying real estate taxes. Line 6 of Schedule A (ie., Itemized Deductions) of respondent's 1993, 1994, and 1995 federal income tax returns indicates that he paid respective real estate taxes during those years of $5,963.10, $5,963.10, and $5,716.00. Dividing $5,716.00 by twelve months yields a monthly real estate tax expense of approximately $476, which, when added to the $5,050 figure and divided by $6,200, yields a percentage of approximately 89%.

**6.** $5,050 (presently budgeted amount for accommodations) − $2,000 (Court-imposed limitation

on accommodations) = $3,050. $3,050 × 36 months = $109,800.

**7.** Pursuant to 11 U.S.C. § 1322(d), a Chapter 13 "plan may not provide for payments over a period that is longer than *three years,* unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than five years." 11 U.S.C.A. § 1322(d) (West 1996) (emphasis added).

**8.** This will particularly be the case if the value of respondent's residence is actually closer to the $483,000 value that respondent asserts such realty was appraised at in 1992. Such a value would net respondent and his wife equity in the realty approximating $131,512.18 (ie., $483,000 − $351,487.82 [amount of three encumbering mortgages]). The sum of $131,512.18 and $109,800.00 is $241,312.18, which exceeds respondent's outstanding unsecured indebtedness of $224,080.95.

burden because he owns such property with his nondebtor wife as tenants by the entirety, (d) his present residence cannot be divested by this Court in the context of this bankruptcy case because it is entireties property that he has properly exempted, (e) the residence is wholly encumbered, that there does not exist any equity therein for respondent, and that nothing would be available for distribution to his unsecured creditors in any event, and (f) he could not fund a Chapter 13 plan without his current residence, thus leaving him without any viable alternative to this Chapter 7 case. The Court, however, disagrees with each of respondent's contentions.

■ Because respondent and his wife do not presently have any dependents, as evidenced by their most recent income tax returns and respondent's Schedule I, the Court must find that any support that they provide to the other six members of their present household is necessarily voluntary in nature. Such support is unquestionably commendable. Nevertheless, such support should not be made at the expense of respondent's creditors and it cannot qualify, in any event, as an extenuating circumstance in the context of his present bankruptcy case. *In re Mastromarino,* 197 B.R. 171, 178–79 (Bankr. D.Maine 1996) (court's disregard for debtor's voluntary support of his domestic partner and her four children was "not a moral judgment, but [rather] a legal one ... [because t]o grant such voluntary expenditures priority over existing legal obligations would be to [incorrectly] permit ... [the debtor] unilaterally to subordinate his creditors to his personal lifestyle choices"); *In re Davidoff,* 185 B.R. 631, 635 (Bankr.S.D.Fla.1995) (While "[t]he Court commends Debtor for the care and concern he has for his family [ (ie., adult children and nondebtor wife),] ... [d]ebtor may not discharge personal liability to creditors so that the funds will be of use to another."); *In re Richmond,* 144 B.R. 539, 542 (Bankr.W.D.Okl.1992) ("debtors' unsecured creditors should [not] be required to

contribute to the voluntary support of family members [ (ie., grandchildren) ] who are not dependents of debtors"). Moreover, the Court is convinced that, notwithstanding respondent's contrary assertion, respondent and his entire present household could obtain adequate shelter at a rate substantially less in amount than $5,050.00.

■ With respect to respondent's assertion that he could not unilaterally dispose of his present residence given that he owns it with his wife as tenants by the entirety, the Court merely notes that both of them could endeavor to dispose of the property if respondent wishes to remain in bankruptcy. The Court is not persuaded by any complaint that respondent's wife should not be forced to surrender her interest in the residence as a consequence of his bankruptcy case because his wife is jointly liable on $179,847.19 of the $224,080.95 (ie., approximately 80 percent) in unsecured indebtedness that respondent seeks to discharge. Furthermore, the Court is surprised, to say the least, that respondent's wife did not jointly file a Chapter 7 petition with respondent given that she is jointly liable for such a large amount of the unsecured indebtedness listed on respondent's Schedule F. Indeed, these unsecured creditors will, if they have not already done so, seek collection from her of such debts. Additionally, her interest in the residence is not exempt from state court process by such unsecured creditors.[9] Given these observations, the Court cannot say that it would be surprised if respondent's wife were to follow respondent into bankruptcy very shortly. The Court must take notice of these observations when assessing both respondent's need for a Chapter 7 discharge as well as his honesty and good faith.

■ Respondent is also incorrect in his assertion that the residence presently is wholly encumbered by the outstanding mortgages on the property because such encumbrances total $351,487.82 while the property

9. *See* the discussion on page 897 of this opinion regarding why respondent's interest is not exempt from state court process by those creditors to which the couple is jointly liable. Respondent's wife's interest is also not exempt from such process for precisely the same reason.

has been valued by respondent (a) at $375,-000.00 in his Schedule A, and (b) at up to $483,000.00 as recently as 1992 as evidenced by letters submitted with his affidavit. Thus, respondent possesses equity in the property despite his contrary assertion. The Court also cannot agree that respondent has properly exempted the residence on his Schedule C. Rather, the Court finds serious fault with respondent's Schedule C, wherein he asserts an exemption for the full value (ie., $375,-000.00 according to respondent) of the residence although (a) the appropriate amount that he should have exempted is limited to his equity in the residence, and (b) such equity, according to respondent's own data, cannot exceed $23,512.18. Most importantly, respondent cannot rely on 11 U.S.C. § 522(b)(2)(B) to exempt his interest in the equity available in the residence because, although such property is owned with his wife as tenants by the entirety, *none* of the interest is exempt from process under the applicable nonbankruptcy law of Pennsylvania. A "debtor is entitled to exempt his interest in ... [a] residence [owned as entireties property, pursuant to 11 U.S.C. § 522(b)(2)(B),] to the extent that his interest is *immune* from process under the law of Pennsylvania concerning tenancies by the entirety." *In re Maloney,* 146 B.R. 168, 171 (Bankr.W.D.Pa.1992) (citing *Napotnik v. Equibank and Parkvale Savings Ass'n,* 679 F.2d 316, 318–19 (3rd Cir.1982)) (emphasis added). However, "entireties property is *not* immune from process by a creditor to satisfy a *joint* debt owed by both spouses." *Id.* (citing *Napotnik,* 679 F.2d at 320) (emphasis theirs). Because respondent and his wife are jointly liable on unsecured debts totaling $179,847.19, which exceeds the equity remaining in the residence regardless of whether such residence is valued at $375,-000.00 or $483,000.00, none of the equity is immune from process under Pennsylvania law. "Were it not for ... [respondent's] bankruptcy, ... [respondent's unsecured

creditors] would be able to bring foreclosure actions and, ultimately, to levy and execute against the property." *Id.* Therefore, even if this Chapter 7 case were permitted to go forward, (a) none of respondent's interest in the residence, held with his wife as tenants by the entirety, could be exempted under § 522(b)(2)(B), and (b) a portion of the residence's value equivalent to respondent's equity would be available for distribution to his unsecured creditors. Finally with regard to this particular issue, the Court reminds respondent that a bankruptcy trustee may sell both his interest and the interest of his wife in the residence, pursuant to 11 U.S.C. § 363(h), so that the value of his interest may be liquidated for distribution to his creditors.[10]

▆▆▆▆ Finally, the Court cannot understand respondent's argument that he could not fund a Chapter 13 plan without his current residence. To the Court it seems clear that relief from the mortgage burden that presently is attached to such residence would leave respondent and his wife with substantial funds to secure adequate shelter for themselves and the remainder of their household while also enabling them to make periodic payments to their unsecured creditors. However, because respondent also asserts that he could not fund a Chapter 13 plan in the event that he retained his present residence, this Court believes that respondent may harbor a belief that he should be able to continue to reside in accommodations equivalent in extravagance to those presently possessed notwithstanding his bankruptcy status. If respondent harbors this belief he is clearly mistaken. Indeed, respondent cannot hope "to maintain his extravagant lifestyle and to receive a discharge while intending to pay nothing to general unsecured creditors." *Bacco,* 160 B.R. at 290. Furthermore, it is doubtful whether respondent could hope to retain his residence in any event if he were to convert to Chapter 13 because the amount

10. *See also* the related discussion on pages 898–99 and in footnote 12 of this opinion regarding the circumstances surrounding respondent's amendment of his Schedule F, that amendment's impact upon his exemption of his interest in the

residence as set forth in his Schedule C, and this Court's determination that it would disallow such exemption under 11 U.S.C. § 105(a) because not to do so would permit respondent to abuse the bankruptcy process.

of future income that a Chapter 13 debtor can expend for living accommodations is also effectively limited to that which is "reasonably necessary." [11]

▆▆▆ Therefore, after appropriately reducing respondent's budget for future monthly expenditures for home mortgage payments and related utility payments, the Court finds that respondent has the ability to repay at least a substantial and not insignificant portion of his unsecured debts out of his future earnings. Because his unsecured indebtedness is less than $250,000 and his secured indebtedness is less than $750,000, respondent, pursuant to 11 U.S.C. § 109(e), would also be eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code. Thus, to grant respondent a Chapter 7 discharge at this time would clearly constitute a substantial abuse of the bankruptcy process. This conclusion dictates that respondent's case either be dismissed or converted, at his behest, to Chapter 13.

### B. *Whether respondent has been honest regarding his bankruptcy case?*

▆▆▆ Although this Court can properly predicate its finding of substantial abuse solely upon respondent's lack of need for a Chapter 7 discharge, the Court feels obligated to mention a few points regarding respondent's honesty vis-a-vis the bankruptcy process. First of all, and as mentioned previously, the Court views as serious the numerous inaccuracies contained in respondent's Schedule C. Put simply, the Court cannot see how respondent could believe, in good faith, that he could exempt either the full value of, or all of the equity in, his residence pursuant to § 522(b)(2)(B) given that it is (a) substantially encumbered by three mortgages, and (b) not exempt from process under the applicable nonbankruptcy law of Pennsylvania. Furthermore, the Court also views with suspicion the market value that respondent attaches to the residence at this time given that he attributed to the same property a value that was more than $100,000 greater only three to four years earlier. The Court also questions why respondent did not indicate in his initial Schedule F that his nondebtor wife was jointly liable on many of the claims listed therein. If respondent had not amended his Schedule F to reveal that much of such debt was actually incurred jointly with his wife, then this Court would not have been able to determine that his exemption of his interest in his residence was improper under § 522(b)(2)(B). Moreover, because such amendment occurred fifteen days subsequent to respondent's § 341 Meeting of Creditors, and because it was in addition to those amendments specifically requested by the Chapter 7 trustee,[12] the Court is not certain whether any of the parties in inter-

---

11. 11 U.S.C. § 1325(b)(1) provides generally that, if a bankruptcy trustee or claimant objects to confirmation of a Chapter 13 plan, such plan cannot be approved by a court unless (a) such objecting claimant's claim is paid in full via the plan, or (b) "the plan provides that all of the debtor's projected *disposable income* to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan." 11 U.S.C.A. § 1325(b)(1) (West 1993) (emphasis added). 11 U.S.C. § 1325(b)(2)(A) defines "disposable income" for the purpose of § 1325(b)(1) as "income which is received by the debtor and which is not *reasonably necessary* to be expended for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C.A. § 1325(b)(2)(A) (West 1993) (emphasis added).

12. The Chapter 7 trustee, in her Notice of Deficiency filed with the Court on May 16, 1996, requested that respondent amend his Schedule F to indicate, in particular, (a) the dates upon which claims were incurred, and (b) the consideration that respondent received for such claims. The Chapter 7 trustee, however, did not request at that time that respondent amend the information contained in the column of Schedule F regarding whether respondent's wife is jointly liable on certain claims. Nevertheless, respondent changed this particular information to indicate that respondent's wife is jointly liable on many of the listed claims. The Court also notes that this amendment is not technically correct because, according to the instructions of Schedule F, such column should only have been used in the event of a joint petition rather than a sole petition as was filed by respondent. Additionally, respondent should have listed his wife as a codebtor on Schedule H rather than to indicate, as he did, that he had no codebtors.

est have been made sufficiently aware of the joint liability that exists on most of the unsecured claims listed in Schedule F. Viewed together, these errors, inaccuracies, and omissions leave plenty of room for one to question respondent's good faith and candor in the filing of his schedules. Because of these circumstances, this Court also wishes to make clear at this time that, if it were necessary, this Court would, at a minimum and pursuant to 11 U.S.C. § 105(a), set aside respondent's exemption of his interest in his residence even though it was not objected to by the appropriate parties (ie., the Chapter 7 trustee or any creditor under FRBP Rule 4003(b)) because not to do so would permit respondent to abuse the bankruptcy process.

With respect to "eve of bankruptcy purchases," 11 U.S.C. § 523(a)(2)(C) sets forth an objective test for nondischargeability of certain purchases and cash advances made within sixty days of a debtor's petition filing. The point of this discharge exception is that such purchases and advances are presumed to constitute "eve of bankruptcy purchases" that a debtor has no intention of repaying at the time when they are incurred. By respondent's own admission, he incurred $14,697.93 in unsecured indebtedness during 1995, the year preceding his petition filing. However, the Court also notes that contained within this figure are (a) a purchase of furniture in the amount of $2,400 on December 29, 1995, and (b) charges totaling $701.38 on a U.S. Air Credit Union Visa during the period from December 23, 1995 to January 5, 1996. Because respondent's petition was filed on February 22, 1996, these purchases and/or advances were made within sixty days thereof and, thus, likely are constructively nondischargeable. The Court also finds somewhat reprehensible the fact that respondent would incur an additional $14,697.93 in unsecured indebtedness at a time when he was already running substantially "in the red." These facts do not reflect favorably upon respondent's good faith in his subsequent Chapter 7 bankruptcy filing.

The Court also finds completely unconvincing respondent's assertion that he was forced into this Chapter 7 case by unforeseen or catastrophic events. Respondent asserts the presence in this case of such an event in the form of respondent's unemployment during much of 1994. However, the Court cannot find that this event, which ended approximately one and one-half (1½) years prior to respondent's petition filing, was either (a) a catastrophic event, given that respondent ultimately obtained employment at a salary approximating 75 percent of that which he earned through his previous employment, or (b) completely unforeseen given the rampant downsizing that has predominated in corporate America over the past decade. Most importantly, the Court finds that respondent's prior unemployment was not the cause of his present bankruptcy case in any event given that (a) he received a pension payout of $187,888.41 from his retirement plan with his former employer in 1994, and (b) the total adjusted gross income for himself and his wife in 1994, inclusive of such payout, was $265,559.13, or approximately *two and one-half (2½) times* the amount of his previous annual salary.[13] Also unconvincing is respondent's assertion that practically all of his unsecured indebtedness was incurred during a period prior to the last couple of years when, because of the funds made available by other members of his household, respondent was able to support his lavish spending habits. The Court need only compare respondent's level of total indebtedness at November 12, 1993—$492,685.63 per respondent's Exhibit D—with such level on his petition date—$579,568.77 as evidenced by the sum of those debts listed on respondent's Schedules D and F—to ascertain that his unsecured indebtedness likely increased by approximately $100,000 during the two years immediately preceding his petition filing given that his mortgaged debt should have steadily decreased during the same period. This fact is even more egregious given the substantial pension payout that respondent

---

**13.** Respondent's joint federal income tax return for 1993 evidences an adjusted gross income for himself and his wife of $112,034.66. $265,- 559.13 divided by $112,034.66 yields 2.37, or a little less than 2½.

received during this period. Given the additional funds, the Court would have expected to see respondent's total unsecured indebtedness drop in amount rather than climb by approximately $100,000 as it appears to have done. Viewing the totality of respondent's circumstances, the Court finds rather convincingly that respondent was ultimately forced into this bankruptcy case by nothing more than many years of his own carefree spending at amounts far in excess of his ability to pay. What is clearly now in order is, as many courts have put it, "good, old-fashioned belt tightening." *Krohn,* 886 F.2d at 128; *Wilson,* 125 B.R. at 746.

Thus, this Court finds that, because respondent's honesty and good faith during this case have been questionable, to grant him a Chapter 7 discharge at this time would clearly constitute a substantial abuse of the bankruptcy process. Therefore, respondent's case must either be dismissed or, if he wishes, converted to Chapter 13.

**III.** ***Whether this Court's granting of the U.S. Trustee's motion to dismiss is (a) equivalent to the commencement of an involuntary Chapter 13 case against respondent, which is prohibited by 11 U.S.C. § 303(a), and (b) in violation of respondent's rights under the Thirteenth Amendment to the United States Constitution?***

▇▇▇ The Court feels that it may properly dispose of these arguments in relatively short order. To put it quite simply, a dismissal by this Court of respondent's Chapter 7 case at this time, given the totality of respondent's circumstances, is not equivalent to the commencement of an involuntary Chapter 13 case against respondent in violation of 11 U.S.C. § 303(a). First of all, a Chapter 13 case will not be commenced unless, and not until, respondent initiates such a petition by his own choice. Furthermore, respondent's argument that a dismissal of his

Chapter 7 case will effectively force him into Chapter 13 is not compelling because, as mentioned in the preceding sentence, he can choose to forego that avenue. Finally, respondent cannot successfully argue either (a) that he must receive *some form of relief* from this Court under Title 11, or (b) that such relief must be through Chapter 7. The following passage from *Krohn* is informative in this regard:

> There is *no constitutional right to a bankruptcy discharge,* and the "fresh start" provided for by the [Bankruptcy] Code is a creature of congressional policy. *United States v. Kras,* 409 U.S. 434, 446–47, 93 S.Ct. 631, 638–39, 34 L.Ed.2d 626 (1973). Congress, within the limits set by the Constitution, is *free to deny access to bankruptcy as it sees fit. Id.* at 447, 93 S.Ct. at 639.

*Krohn,* 886 F.2d at 127 (emphasis added). Thus, respondent cannot receive a Chapter 7 discharge from this Court in any event given the totality of his circumstances at this time. Furthermore, respondent will likely experience similar difficulties in a Chapter 13 case, in the event that he ultimately chooses to convert, unless he is willing to reduce his budgeted expenditures for living accommodations. Consistent with *Kras,* that respondent may not receive any form of relief from this Court in the event that he is not agreeable to a rearrangement of his proposed terms is clearly constitutional.

▇▇▇ The above discussion also disposes of respondent's argument involving the Thirteenth Amendment to the U.S. Constitution,[14] which generally prohibits *involuntary* servitude. If respondent wishes to proceed under Chapter 13 of the Bankruptcy Code, he will only do so willingly and of his own volition. That he may be effectively forced into such a predicament does not constitute involuntary servitude because he can nevertheless refuse to proceed under Chapter 13. If respondent chooses to proceed under

---

**14.** The Thirteenth Amendment to the U.S. Constitution provides, in pertinent part, that:
 Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Chapter 13, the length of his repayment plan will likely be a mere three years, and in no event will it exceed five years (not seven years as asserted by respondent).[15] Furthermore, respondent would not be compelled to toil for the benefit of his creditors during this time because neither the nature nor extent of his employment is controlled by any section of the Bankruptcy Code. Indeed, respondent can retire completely from the workforce at any time if he so chooses although such action is, practically speaking, not an option given his numerous financial obligations, many of which would not disappear in any event. Clearly, if Chapter 13 of the Bankruptcy Code were to even colorably implicate the Thirteenth Amendment, it would have been stricken long ago.[16] It suffices to say that *Chapter 13 of Title 11 has not been stricken in any form.*

### *CONCLUSION*

The Court concludes that to grant respondent a Chapter 7 discharge would be a substantial abuse of the bankruptcy process given that (a) respondent is not in need of a Chapter 7 discharge, and (b) his honesty and good faith during this case have been questionable. The Court, therefore, will **GRANT** the U.S. Trustee's motion and dismiss respondent's case pursuant to § 707(b) unless respondent formally requests conversion of his case to Chapter 13 within ten (10) days from the date of this opinion. If the case is converted to a Chapter 13 proceeding, it will, of course, be potentially subject to later dismissal under 11 U.S.C. § 1307(c). The Court also holds that its decision is not equivalent to the commencement of an involuntary Chapter 13 case against respondent because respondent may nevertheless refuse to proceed in Chapter 13. Therefore, this Court's

decision does not violate § 303(a). Finally, this Court's decision is constitutionally sound because, although it may ultimately prompt respondent to convert his case to Chapter 13, it neither requires such conversion nor that respondent maintain his present level of employment.

---

15. *See* 11 U.S.C. § 1322(d) and footnote 7 to this opinion.

16. Because this argument of respondent implicates "the constitutionality of an[ ] Act of Congress [ (ie., the Bankruptcy Code) ] affecting the public interest," the Court has complied with 28 U.S.C. § 2403(a), which mandates that "the court shall certify such fact to the Attorney General, and shall permit the United States to inter-

vene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality." To date the United States has not sought to intervene in this case with respect to the question raised by respondent. The Court interprets the United States' inaction in this regard as perhaps an indication of its assessment of the merit of respondent's argument.